(No. 38264.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MARVIN KURTH *et al.,* Plaintiffs in Error.

*Opinion filed March 24, 1966.—Rehearing denied May 18, 1966.*

SCHAEFER and UNDERWOOD, JJ., concurring in the result.

MICHAEL H. BROKIN, of Chicago, (BELLOWS, BELLOWS & MAGIDSON, of counsel,) for plaintiffs in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE, RONALD BUTLER, and THOMAS A. HETT, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE KLINGBIEL delivered the opinion of the court:

Marvin Kurth, Edward Tomek, Louis Cech, Robert Korycki, Harold Gurevitz, Joseph Polerecky and Dominic Prohm, were indicted by the grand jury of the criminal court of Cook County for the crime of conspiracy to obtain the money and property of Stickney Township by false pretenses. They were jointly tried by jury resulting in the acquittal of Prohm and verdicts and judgments of guilty as to the others. Kurth was sentenced to the penitentiary, for a term of not less than 2 nor more than 5 years. Gurevitz, Tomek, Korycki and Polerecky were sentenced to jail for terms of six months, and Cech was sentenced to jail for a term of 30 days. A writ of error was issued to review the judgments of conviction as to all of the defendants who were found guilty.

Prior to trial this case had received wide-spread newspaper publicity which is well demonstrated by the fact that when the case was first set for trial the defendants requested a continuance because of adverse newspaper publicity and the court granted the continuance for a period of two weeks so that a new venire could be called. The court stated that in his opinion it would be reversible error, under the circumstances, to deny the continuance, and stated that he did not think that the court, or anyone else, should be required to call 200 prospective jurors in an attempt to find 12 impartial jurors. When the case was thereafter called for trial the court asked the first group of prospective jurors whether any of them remembered reading about the case or had heard of it on radio or television. Twenty-eight prospective jurors revealed that they had heard of the case and these jurors were temporarily segregated from the group which had not heard of the case and the examination of prospective jurors commenced with the latter group. After examination of the group had been completed, during which a considerable number of jurors were excused either for cause or by the exercise of peremptory challenges, the court interrogated the jurors who had knowledge of the

case individually in chambers. As a result of this examination 12 prospective jurors were excused for cause. Of the next group of prospective jurors 44 had some knowledge of the case by reason of the publicity which it had received and as a result of the interrogation in chambers 23 of this group were excused for cause. A third group of prospective jurors was asked if they had heard of the case and so many of them stood up that the trial court stated that he thought it would be best to examine them one at a time. After several jurors had been examined in chambers and excused for cause the defendants moved to discharge the entire venire and change the venue from Cook County on the ground that it had become apparent that it would be difficult, if not impossible, to obtain an impartial jury. This motion was denied and after several more jurors were likewise excused on the ground that they had a knowledge of the case the motion was renewed and again denied. In the course of the interrogation of the prospective jurors in chambers it was brought out that the prospective jurors had been discussing the case in the assembly room and were passing around newspaper articles relating to the case and the difficulty which was being encountered in the selection of a jury. The defendants renewed their motion for a change of venue out of the county and requested the court to conduct an investigation of the events which had occurred in the assembly room. Again the motion was denied. The same pattern continued throughout the examination of the prospective jurors, with the end result that 234 prospective jurors were called, of which 90 were excused for cause. The defendants exhausted their 70 peremptory challenges before 12 jurors had been selected. It is apparent that in view of the facts disclosed by the record the task of obtaining an impartial jury was a difficult one and the court should have exerted every effort to insure that such a jury was obtained. In the light of this background we consider the defendants' contention that they were preju-

diced by the retention on the jury of a certain juror. The facts in support of this claim are as follows:

After 8 jurors had been selected the court called defense counsel into chambers and told them that he had been advised by the bailiff that one of the jurors had been crying because she was tired of sitting in the jury room. The judge refused to disclose the name of this juror and refused to excuse her. The following day the court again discussed this situation with counsel and told the attorneys that he had talked to the juror. She had told the court that she was nervous and also told him that she came from a home where her father was a heavy drinker and that every once in a while he would take the children and lock them in an attic and that ever since then she had had a fear of confinement. The juror told the court that the time she had spent in the jury room had made her nervous and that she had said that if she could stay out in the corridor she would feel better. One of the defense attorneys asked the court how this feeling on the part of the juror would affect her deliberations when the case was concluded and the jury was confined for the purpose of arriving at a verdict. The court said that he had questioned the juror about that and told her that he would try to cooperate during the trial so that if there were matters to be heard out of the presence of the jury he would bring the lawyers into chambers so that the jury could remain in open court and would have to spend as little time as possible in the jury room. The court said that he had told the juror that it would not be fair for either side for her to cut short her deliberations after a few hours of confinement and that she told the judge that she did not think this would be a problem for her. Counsel then made a motion for the withdrawal of the juror and a mistrial on the ground that they could not receive a fair and impartial trial because of the condition of this juror. The court denied the motion.

The trial was lengthy and the issues were complicated.

The selection of the jury commenced on January 21, 1963, the case continued to March 27th and the record contains more than 7000 pages. While we are unable to determine whether the deliberation of the juror in question was, in fact, influenced by her fear of confinement, in a case of this magnitude, where of necessity lengthy deliberation would normally be required to consider the evidence and the instructions of the court, the possibility of prejudice is high. The difficulty which the parties encountered in selecting a jury who had no preconceived notions concerning the case has already been related. To accept a juror who acknowledged a longstanding fear of closed places and to deny counsel the right to interrogate this juror, or even disclose her name, was, under the circumstances prejudicial error. Although we are reluctant to reverse these convictions for an error which occurred even prior to the reception of the voluminous testimony, we are of the opinion that the interests of justice require that a new trial be granted.

The other contentions relied upon by the defendants are that the court erred in denying motions for a mistrial which were made during the course of the trial on the ground of prejudicial publicity; that the court erred in admitting certain tape recordings in evidence; that the evidence was insufficient to establish the defendants' guilt; that certain statements of alleged co-conspirators were improperly admitted; that the court unduly restricted the defendants' right to cross-examination; that the defendant, Kurth, was sentenced to a term in excess of that provided by law; and that the court erred in failing to give a certain instruction. Of these allegations we deem it necessary to consider only the question of the tape recordings, for the other claims relate to matters that probably will not arise on a second trial.

Although it is not necessary to set forth all of the evidence, a brief statement of the issues is appropriate. The defendants, Tomek, Gurevitz, Korycki and Polerecky and

Cech were officials of Stickney Township, and the defend-
ant, Kurth, was the township committeeman for a regular
political party and was the principal founder of a new
political organization known as the Citizens Action Party,
which was responsible for the election of the above officials
and the election of Robert Smith as township supervisor.
It was the theory of the State that the defendants con-
spired to defraud the township by paying exorbitant sal-
aries and prices for services and goods and receiving "kick-
backs" from the payees. The principal witness for the State
was Robert Smith. He testified that after the election Kurth
and the other defendants told him the plans they had made
for obtaining money from employees and suppliers and it
was proposed that all such money would be divided into
ten shares, to be split between the six defendants and Smith,
with Smith, Tomek, and Polerecky getting 2 shares and the
others one share. Several months after the election Smith
reported the scheme to a Chicago newspaper and it was
arranged to obtain tape recordings of conversations between
Smith and the defendants. The first of such recordings was
of a meeting in Kurth's office at which Smith and all of the
defendants except Polerecky were present. Prior to the
meeting Smith had concealed a small radio transmitter on
his person and a receiver and tape recorder had been in-
stalled in Smith's office in the same building. The second
and third recordings were of telephone conversations be-
tween Smith and a secretary from whom a kickback was
allegedly to be obtained and between Smith and Kurth.
These recordings were made with the aid of an electronic
device which made it possible to hear both sides of the tele-
phone conversation. The last recording was of a conversa-
tion between Smith, Kurth and the secretary and was made
in the same manner as the first recording. All of these re-
cordings were admitted in evidence over the defendants'
objection. Without detailing the conversations disclosed
by the recordings we believe it sufficient to say that the

evidence, if improperly admitted, was prejudicial to the defendants.

The issue of whether the recordings were properly admitted depends upon a construction of certain provisions of article 14 of the Criminal Code of 1961. Section 14—1 provides as follows:

"(a) Eavesdropping device.

An eavesdropping device is any device capable of being used to hear or record oral conversation whether such conversation is conducted in person, by telephone, or by any other means; Provided, however, that this definition shall not include devices used for the restoration of the deaf or hard-of-hearing to normal or partial hearing.

(b) Eavesdropper.

An eavesdropper is any person, including law enforcement officers, who operates or participates in the operation of any eavesdropping device contrary to the provisions of this Article . . ."

Section 14—2 provides as follows:

"A person commits eavesdropping when he:

(a) Uses an eavesdropping device to hear or record all or any part of any oral conversation without the consent of any party thereto; or

(b) Uses or divulges any information which he knows or reasonably should know was obtained through the illegal use of an eavesdropping device."

Section 14—5 provides that any evidence obtained in violation of the article is not admissible in any civil or criminal trial. It is undisputed that Smith, who was one of the parties to all of the recorded conversations, consented to the recording of these conversations, and the State contends that his consent alone is sufficient to make the recording admissible. This claim finds some support in certain language contained in *People* v. *Dixon,* 22 Ill.2d 513, which was not necessary to the decision in that case. The *Dixon* case has

been cited with approval in *U.S.* v. *Pullings,* 321 Fed. 2d 287, (7th cir. 1963) and in *Magee* v. *Williams,* 329 Fed. 2d 470 (7th cir. 1964). The defendants contend, on the other hand, that Smith's consent alone is insufficient to permit the use of the recordings and argue that the statute must be read to require the consent of all of the participants in the conversation.

Many Federal cases and cases from other jurisdictions hold that if one party to a recorded conversation consents to the recording the evidence is admissible, even though the consenting party is the one who is making the recording or carrying a concealed transmitting device without the knowledge of the other parties. These authorities are of little assistance to us in construing the above provisions for they do not involve a statute in any way similar to the one in this case.

A reference to the Committee Comments sheds some light on the intent of the legislature in adopting this statute. The Committee states that the reason for the legislation is to protect the privacy of the individual, the right to which is considered by many to be one of the fundamental civil liberties of our system. The comments also point out that no one seems to favor eavesdropping by private individuals and the issue is whether or not law enforcement officers should be permitted to do it. In its comments the Committee draws a distinction between the Illinois statute and the provisions of the New York law, and notes that New York permits law enforcement officers to eavesdrop under supervision of the courts while the Illinois statute retains in substance the complete prohibition against eavesdropping which had previously been in effect in Illinois. It is apparent that the Committee which drafted these provisions was opposed to eavesdropping as an unwarranted invasion of the privacy of individuals. Having in mind this expression of legislative intent, we believe that it is unreasonable to suppose that

the legislature intended that the consent of the party who is surreptitiously recording the conversation of others can make the recorded conversations admissible against the other parties, who were unaware that their conversations were being recorded.

In our opinion the true construction of these statutory provisions lies between the opposing constructions urged by the State and the defendants. It seems to us that the reasonable construction of the statute, which will insure the right of privacy, is that any party who has not consented to the recording or transmission of his conversation may bar its admission in evidence against him. Other parties to the conversation who may have consented to the recording or transmission cannot object to the use of the recorded conversation. Thus, for example, in a four-party conversation three of the parties may know that the conversation is being recorded and may consent to the recording while the fourth party may be unaware of this fact. As to "any party" who has consented the recorded conversations are admissible, but as to the one party who has not consented, the recording is inadmissible. This construction carries out the legislative intent and follows the language used by the legislature without the necessity of construing the word "any" to mean "all". This construction has been suggested to be the fair construction of the statute. (Cleary, Handbook of Illinois Evidence, sec. ed., sec. 10.10, page 164.) In the present case only Smith, who was instrumental in obtaining the recordings, consented to the transmission and recording of these conversations. Since none of the other parties to the conversations had any knowledge that the conversations were being recorded and did not consent to such recording, the recordings are inadmissible against them. To the extent that *People* v. *Dixon,* 22 Ill.2d 513 may be construed to hold to the contrary, it is overruled.

The judgment of the criminal court of Cook County is

396

reversed and the cause is remanded for a new trial in accordance with the views expressed in this opinion.

*Reversed and remanded.*

Mr. JUSTICE SCHAEFER, concurring in the result:

This case involves the construction of a statute which creates a crime, not a statute whose sole or primary purpose is to govern the admissibility of evidence. What the statute says is: "A person commits eavesdropping when he: (a) Uses an eavesdropping device to hear or record all or any part of an oral conversation without the consent of any party thereto; * * *." The crime of eavesdropping may be punished by imprisonment in a penal institution for as much as one year, by a fine of as much as $1000 or by both imprisonment and fine. The statute also provides that "Any evidence obtained in violation of this Article is not admissible in any civil or criminal trial, or in any administrative or legislative inquiry or proceeding, nor in any grand jury proceedings." The only exception to this flat rule of inadmissibility is that evidence of "an alleged unlawfully intercepted, overheard or recorded conversation * * * may be admitted into evidence in any criminal trial or grand jury proceeding brought against any person charged with violating any provision of this Article." Ill. Rev. Stat. 1965, chap. 38, par. 14—5.

These provisions render evidence inadmissible only when a crime has been committed in obtaining it, and the offense of eavesdropping is either committed or not at the moment that the recording of the conversation takes place. The issue in this case, therefore, is whether a person records a conversation "without the consent of any party thereto" when he records a conversation to which he is a party without the consent of the other participants. The evidence in question is inadmissible only if the statute which makes it a crime to record a conversation without the consent of *any* party

thereto is to be read to make it a crime to record a conversation without the consent of *all* parties thereto.

I would not so read the statute. If the statute requires consent of all parties to a conversation, a businessman who, in the interest of preserving an accurate record, has his secretary listen in on an extension phone and take down the exact words used, commits a crime unless all other parties to the conversation consented to its recording in this fashion. Such a reading of the statute would be contrary to the recognized definition of eavesdropping: "eavesdrop, v.i. to stand under the eaves, or near the windows of a house in order to overhear what is said within doors; hence, to listen secretly to the private conversation of others." Webster's New International Dictionary, 2d ed.

The majority opinion states: "It is apparent that the Committee which drafted these provisions was opposed to eavesdropping as an unwarranted invasion of the privacy of individuals," and the majority's interpretation of the statute rests upon "this expression of legislative intent." But the Committee to which the majority refers did not draft these provisions, and it specifically refrained from expressing any opinion as to their merit. The Committee Comment to the eavesdropping sections states: "By retaining, in this Code, the former legislation in substantially the same form, the Committee specifically refrained from endorsing it as desirable or practicable." (S.R.A., chap. 38, art. 14, Committee Comments) Moreover, it is not clear that prohibiting a person from recording his own conversations furthers any substantial interest in privacy. He remains free to testify to the conversation. Suppressing the recorded version means only that the accuracy of his recollection can be more readily disputed.

Mr. JUSTICE UNDERWOOD, also concurring in the result:

I agree with the majority that a new trial is necessitated by the substantial possibility of prejudice manifested in the

jury selection proceedings and retention of the "claustro-phobic" juror in the circumstances of this case; I disagree as to the construction of the eavesdropping statute.

While resolution of the problem in this case rests upon statutory construction, it is noteworthy in a determination of legislative intent that the great weight of authority in other jurisdictions is that tape recording or wireless broad-cast of conversations violates no constitutional rights where accomplished in the manner here present and one of the parties to the conversation has consented to the recording. (See Anno. 97 A.L.R. 2d 1285, 1304.) Much has been written and said of the merits, or lack of them, of eaves-dropping practices, but they are substantial and highly ef-fective law enforcement tools when constitutionally used. (See *Lopez* v. *United States,* 373 U.S. 427, 10 L. Ed. 2d 462, where an electronic eavesdropping device was described by the Supreme Court as a means "to obtain the most reli-able evidence possible of a conversation.") See, also, The Wiretapping-Eavesdropping Problem, Reflections on The Eavesdroppers, 44 Minn. Law Review, 813, 866, where a prominent defense attorney says:

"Such practices (concealing microphones to record con-versations where no party consents) must be distinguished from situations where a conversation is recorded or trans-mitted with the consent of one participant. Law enforcement officers, for example may wear a concealed recording device when interviewing suspects or witnesses. Informers may agree to have a microphone concealed in their clothing when they engage the suspect in an incriminating conversation, so that police officers can overhear the conversation and testify about it in court.

"Such conduct may be unethical. Many people whose views I respect also think it is unconstitutional. Their rea-soning, however, has never completely persuaded me on this point. Every time we engage in a conversation we run the risk that the other party may betray us. He may reveal what

we have said to our personal enemies, our business competitors, or the police. He may try to blackmail us. Such risks are inherent in human relationships. They are in essence no different from the risk that the person in whom we confide has arranged to record or broadcast what we say by means of some concealed device. The only real distinction is that a simultaneous record or broadcast is more complete and exact than any subsequent report. This is a distinction in degree but not in essence."

Our statutory provisions are contained in the Illinois Eavesdropping Act. (Ill. Rev. Stat. 1965, chap. 38, art 14). Section 14—5 thereof prohibits use of any evidence obtained in violation of the act, and the question is whether recording of conversations with the consent of one of the parties to the conversations constitutes a violation of the act thus rendering the recording inadmissible in evidence against the nonconsenting participants. The answer is dependent upon the construction of section 14—2: "A person commits eavesdropping when he: (a) Uses an eavesdropping device to hear or record all or any part of any oral conversation without the consent of any party thereto; * * *".

I believe no violation of this statute occurs and that recordings of conversations are admissible in evidence against all parties where any one of the parties thereto has consented to such recording. I think this is apparent from the statute itself, and I thought this interpretation clearly indicated by our language in *People* v. *Dixon,* 22 Ill.2d 513, 516, a view shared by the Federal bench in Illinois. *United States* v. *Pullings,* (7th cir.) 321 F.2d 287; *Magee* v. *Williams,* (7th cir.) 329 F.2d 463, 470.

The controlling sentence in the act (section 14—2(a)) provides that a person commits eavesdropping when he "uses an eavesdropping device to hear or record *all* or *any part* of any oral conversation without the consent of *any* party thereto." (Emphasis added). Had the intention of the legislature been as the majority infer, it seems the logical choice

of the drafter would have been "without the consent of *all parties* thereto." This conclusion is strengthened by the fact that both "all" and "any" were used in the preceding portion of the quoted sentence, and I believe the drafting choice must be viewed as deliberately and intentionally made. So viewed, "without the consent of any party", to me, leads only to one conclusion, and that is that recorded conversations are admissible against all parties thereto if consented to by any party. While the majority, in reaching the contrary conclusion, refer to 1959 Committee Comments, our language in *Dixon* was written in 1961, and, presumably, after consideration of the same comments now referred to as supporting a contrary conclusion. Additionally, I believe the majority misconstrue the Committee Comments, since the "complete prohibition against eavesdropping" referred to by the Committee as retained in Illinois is the absolute bar to *ex parte* eavesdropping, *i.e.,* recording thereof by one not a party to the conversation. This is permissible in New York under court supervision, but not in Illinois, and it was the intent to retain this prohibition to which the Committee, in my judgment referred. In fact, the whole intent of the statute is to do precisely this: make *ex parte* eavesdropping a criminal offense and preclude use of its fruits.

The defendants argue that action by the 1963 legislature in adopting an amendment to section 14—2(a) in which the word "all" was substituted for the word "any" indicates our construction in *Dixon* was not in accord with the original intent of the legislature. This amendatory legislation was vetoed by the Governor, and, whether our construction in *Dixon* accorded with legislative intent in 1963 or not, it is apparent that the Governor considered *Dixon* as an accurate interpretation, and we have heretofore held that gubernatorial action is an integral part of the legislative process. *Williams* v. *Kerner,* 30 Ill.2d 11, 14.

While the majority opinion states that the construction therein adopted (that any party who has not consented to

the recording or transmission of his conversation may bar its admission in evidence against him) lies between the opposing contentions of the State (admissible against all parties if any consent) and the defendants ( admissible only if all consent), I see no practical difference between excluding the recorded conversations as to the nonconsenting parties and excluding them entirely. It is apparent that no party who has consented to the conversation will incriminate himself therein; to permit use against such party accomplishes nothing, whereas exclusion of the recording as to the nonconsenting parties emasculates its use for law enforcement purposes and is, in practical effect, the complete prohibition sought by defendants. In operation, the construction accomplishes the precise result which the majority seek to avoid—construing "any" to mean "all".

I feel, also, some responsibility to call attention to the possibility of a future problem if the majority construction stands. In the example set forth in the final page of that opinion three of four parties to a conversation have consented to recording thereof. Has the offense of eavesdropping been committed? I am uncertain, for the majority say the recording is admissible as to the consenting parties although section 14—5 prohibits use of any evidence obtained in violation of the article. Seemingly, this prohibition is absolute, since no differentiation appears as between consenting and nonconsenting parties. Stated conversely, if the recording is inadmissible as to the nonconsenter, because the statute has been violated, how, in the absence of any distinction in the governing statute, does it become admissible as to the consenting ones? Only, it seems to me, by judicial fiat devoid of statutory basis.

In short, I believe our duty is to interpret the statute as it is written—not as we would have written it. I think the construction given this statute in *Dixon* correct, and that consent to recording thereof by any party to a conversation renders the recording admissible against all.