THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TYRONE PERRY, Defendant-Appellant.

First District (4th Division)    No. 77-1314

Opinion filed December 18, 1980.

James J. Doherty, Public Defender, of Chicago (Willie Wright, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Richard F. Burke, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Tyrone Perry, was indicted for the murder of Reuben McQuerter. Following a bench trial, defendant was found guilty of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and sentenced to a term of imprisonment of 14 years to 14 years and 1 day. Defendant appeals, and we affirm.

The issues presented for review are (1) whether defendant was

proved guilty beyond a reasonable doubt, and (2) whether the conviction for murder should be reversed and a finding of voluntary manslaughter entered.

The State's first witness, Carolyn McQuerter, decedent's wife, testified that on July 17, 1975, she, her husband, Reuben, and her 3-year-old daughter lived in the second floor apartment at 6410 South Evans, in Chicago. At about 10:30 that evening, she and her daughter took their dog for a walk and saw defendant sitting and talking with a man on the back porch of the building at 6412 South Evans. Her daughter approached defendant and asked the whereabouts of his son. Defendant told the child that he and his friend were having an adult conversation; he then began cursing the child. The witness stated she told defendant not to talk to her child in that manner, whereupon defendant began swearing at her. She then returned to her apartment with her daughter and the dog.

Carolyn further testified that upon entering her apartment, she did not tell her husband of the altercation between her and defendant, and when her husband asked why she was crying she did not answer. According to the witness, she did not discuss the incident with her husband.

In further testimony, Carolyn stated that she, her husband and their daughter went downstairs. After initially confronting defendant, her husband told her to take the child and return to their apartment, which she did. There, she called the police. The witness stated she then went downstairs, taking her daughter next door to the home of a friend, and waited for the police. Shortly after going outside, she heard three gun shots.

On cross-examination, Carolyn first testified that her husband did not say anything to defendant when the two men met. However, she later stated that she could not recall what her husband said to defendant. She also testified that her husband did not own any handguns.

Officer Palone testified that he and his partner received a call of "shots fired" on July 17, 1975. They arrived at 6410 South Evans at approximately 11:30 p.m. The officer stated he ran through a gangway and spotted defendant holding a revolver. Officer Palone ordered defendant to drop the gun and defendant obeyed, stating, "I shot him." The witness stated he then saw the bleeding victim lying on the first floor landing by the doorway. Officer Palone testified that the only weapon recovered that evening was the one in defendant's possession.

Officer Maurice Clayton's testimony was substantially the same as that of Officer Palone, his·partner. Officer Clayton also asked who had done the shooting; defendant answered, saying, "I shot him," and "I told the m-----f----- to quit f------ with me."

The State called Adolph Newton to testify regarding the events

surrounding the shooting. Newton stated that he arrived home from work at approximately 11:30 p.m. on July 17. He saw defendant and another man sitting and drinking at the rear of the 6410 South Evans. The witness said he spoke to the men, at which time defendant stated that "the woman was messing with him about the kids." Newton advised defendant to ignore the incident. Newton then went into the house. Shortly thereafter, he heard gunfire. Further testifying, Newton stated he went to the back window of his apartment from which he could see the backyard at 6410 South Evans. He saw defendant standing in the yard with a gun in his hand. Two other people were standing on the back stairs. He also saw McQuerter lying in the doorway. Later, Newton went out into the yard and saw the police with defendant. The witness stated he heard defendant say that McQuerter threatened him, so he shot him.

The State called Sylvester Turner who testified that he heard the conversation between defendant and Carolyn on the night in question. Turner, who lived at 6414 South Evans, stated he heard defendant say to Carolyn "Get your brat away from over that way." Replying, Carolyn told defendant that was not the way to talk to a child, and she and defendant began swearing at each other. According to Turner's testimony, Carolyn walked away and 5 to 10 minutes later he heard gun shots coming from 6410 South Evans.

Larry Paynes, defendant's brother-in-law, was called as a defense witness. He testified that on July 17, 1975, he lived at 6410 S. Evans. About 11:30 that evening, as he was walking toward his building, he saw McQuerter standing on the rear steps, blocking the doorway. Paynes did not see anything in McQuerter's hand. Paynes heard defendant say to McQuerter that he had done nothing to Carolyn or her daughter. McQuerter cursed and told defendant he would kill him. According to the witness, defendant was standing in the yard several feet from McQuerter who was standing in the doorway. As Paynes proceeded up the stairs, he had to pass between defendant and McQuerter. At that moment, defendant said, "I'm tired; I'm tried of this s---." The witness testified that he saw defendant pointing a gun in his direction. The shooting began. Paynes stated he did not see McQuerter once the shooting commenced.

In further testimony, Paynes stated he was treated at the hospital for bullet fragments in his nose and chest. Thereafter, he was transported to jail where he was questioned by the police. After he left the police station and went home, he discovered his keys were missing. According to the witness, when he went outside the next day to search for his keys, he found a gun between the fence and the stairs. He took the gun and placed it in his desk drawer for 2 weeks. Sometime thereafter, he showed the weapon to a friend, placed it back in the drawer and did not remove it until September 28, 1975, when he gave it to the defense attorney. Paynes testified that he did not tell any police officer or assistant State's Attorney

about the gun while it was in his possession, and he did not tell the grand jury that he had found a gun. He did identify the gun he found as one of defendant's exhibits.

Robert Peoples testified that on July 17, 1975, he arrived at the rear of 6410 South Evans with Larry Paynes and Larry's wife about 11:30 p.m. He saw defendant standing in the yard and another man in the doorway. He heard defendant ask the man to let him into the apartment. Peoples went past the man and into the building. He stated he saw a pistol on the second step inside the building approximately 3 feet away from the man in the doorway. Peoples entered Paynes' apartment. When asked whether he saw the shooting, Peoples replied that he stepped back out of the apartment upon hearing the gunfire, but he did not see defendant fire any shots. After the shooting, the witness stated he saw that Paynes was bleeding and McQuerter was lying in the doorway. Peoples testified that he later told Paynes he had seen the gun on the stairs.

Samuel Davis testified that on July 17, 1975, he went to 6410 South Evans to visit defendant. He saw a man standing in the back door, cursing loudly and stating that he was going to kill defendant. According to the witness, defendant stated he did not want to be bothered. The man then reached back into the doorway and came out with a pistol in his left hand. At that point, Davis began to run, and as he ran he heard gun shots.

Defendant testified that he lived at 6410 South Evans on July 17, 1975. That evening he and another man were having a conversation on the porch of 6412 South Evans. He saw Carolyn McQuerter and her daughter take their dog into the alley and return about 25 minutes later. Defendant stated he saw the child approaching and warned his friend to watch his language. The man asked defendant to send the child back to her mother, but defendant replied that he did not want to say anything. According to defendant's testimony Carolyn and her daughter went to the top of the stairs and Carolyn began calling him and his friend "a bunch of m----- f------."

Defendant further testified that he and his friend were still seated on the porch when Reuben McQuerter came downstairs. McQuerter began wrestling with Carolyn and said, "Come on; let's go upstairs." Carolyn then accused defendant of having called McQuerter's daughter "a name." McQuerter and his wife went upstairs together, but McQuerter came back down. Defendant left the porch and began walking toward the building at 6410 South Evans after his companion suggested there might be trouble. As defendant neared the building, McQuerter approached him and asked why he had cursed his daughter. Defendant stated he denied the accusation. McQuerter walked back upstairs but told defendant he would be back. When McQuerter returned a few minutes later, he said, "M-----f-----, I'm going to get you. I heard what you said to my daughter. I'm tired of your s---." McQuerter headed upstairs again, saying

he was "going to get his stuff." The defendant stated he thought McQuerter was referring to a gun, so he ran into his apartment. According to the witness, about 15 minutes later he left his house, walked through the alley and then went toward 6410 South Evans. There, he saw McQuerter standing in the doorway. McQuerter cursed defendant and threatened him. Defendant told McQuerter that he, too, had a gun, at which point McQuerter ran upstairs, shouting that he was going to get his "s---." However, according to the witness McQuerter did not ascend all of the stairs but turned around and came back down with a gun. Defendant testified that he could not see what McQuerter was doing, but he was hiding "something" behind the door.

Further testifying, defendant stated that Larry Paynes, his wife, and Robert Peoples walked into the backyard. Defendant said he and Paynes attempted to pass McQuerter who was blocking the doorway. McQuerter then said, "M----f-----, I'm going to kill you," and reached for his gun. McQuerter appeared to lose his balance and at that moment defendant pulled his gun, shooting McQuerter four times. Defendant then ran into the apartment and called the police. He also testified that he did not see what happened to McQuerter's weapon.

In further testimony, defendant stated he was taken to the police station where he was given *Miranda* warnings and questioned in the presence of a police investigator, an assistant State's Attorney, and a court reporter. He then read and signed the statement. At trial, defendant stated he told the police upon questioning that on the night of the shooting he saw McQuerter with a gun in his hand but this report was not included in this statement because the court reporter was not in the room at that time.

In rebuttal, the State recalled Officer Clayton. The officer testified that the scene of the shooting was sealed off from the general public after the police arrived. The police searched the area and found four gun casings; Clayton retrieved one shell near the fence. He also looked in the area between the fence and the concrete stoop but found nothing. The State called another police officer who testified he had also looked in the area around the stoop and along the fence. He did not find any shell casings or a weapon.

Assistant State's Attorney Thomas White testified that on February 2, 1977, he questioned Robert Peoples about the shooting of McQuerter. Peoples related that he was present at 6410 South Evans and saw defendant and McQuerter. He told White he saw a gun on the stairs behind McQuerter, and as he bent over to get a closer look at the gun McQuerter told him not to bother it. According to White, Peoples then stated he went upstairs, put down a bag and came back downstairs. He heard McQuerter say, "I'm going to kill you, MF," then he saw McQuerter reach for the gun with his left hand. Peoples ducked inside just before the shooting.

Assistant State's Attorney White also testified that he spoke with Samuel Davis on February 2, 1977. Davis stated he saw McQuerter reach to his right and pull out a gun. Davis was called by defendant in surrebuttal. He testified that he remembered the gun being in McQuerter's left hand. He further stated that White had not asked him during the demonstration whether the gun had been in McQuerter's right hand or his left hand.

Following closing arguments, the court found defendant guilty of the murder of Reuben McQuerter.

Defendant asserts on appeal that he was not proved guilty beyond a reasonable doubt because the evidence offered by the defense was more than sufficient to establish that the homicide was committed in self-defense. The State maintains defendant was proved guilty of murder beyond a reasonable doubt.

The issue of self-defense is one of fact, and it is the function of the trial court, sitting as trier of fact, to resolve any conflicts in the evidence and determine credibility of the witnesses. *People v. Brown* (1974), 19 Ill. App. 3d 757, 762, 312 N.E.2d 789, 794.

As a reviewing court, we will not disturb the court's findings unless the evidence is so improbable, unreasonable or unsatisfactory as to raise a reasonable doubt as to guilt. *People v. Hill* (1977), 53 Ill. App. 3d 280, 285, 368 N.E.2d 714, 718.

■■ Defendant contends he shot McQuerter in self-defense. The use of deadly force against another is justified only where a person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." (Ill. Rev. Stat. 1973, ch. 38, par. 7—1; *People v. Carpi* (1976), 44 Ill. App. 3d 364, 370, 358 N.E.2d 355, 360.) The trier of fact does not have to accept as true the testimony presented by defendant concerning self-defense, but, rather, in weighing such evidence he must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and other witnesses' testimony. *People v. Holtz* (1974), 19 Ill. App. 3d 781, 790, 313 N.E.2d 234, 241-42.

■■ In the instant case, defendant contends the killing was justified because McQuerter pointed a gun at him and threatened to shoot him. However, we find the evidence in the record was sufficient to permit the trial court to determine that defendant's actions did not constitute self-defense because the defendant did not reasonably believe the force he used was necessary to prevent imminent death or great bodily harm to himself.

Defendant testified at trial that McQuerter threatened him and he saw a weapon in McQuerter's hand. The other defense witnesses testified that they also saw a weapon in McQuerter's hand. However, the weapon that allegedly was recovered by Paynes was not given to the defense attorney until over 2 months after the occurrence. He did not tell the

police or the assistant State's Attorney about the gun while it was in his possession.

The police testified that the area was sealed off and searched immediately after the shooting and no evidence of another weapon was found. Where the evidence is merely conflicting, a reviewing court will not substitute its judgment for that of the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99, 347 N.E.2d 733, 735.) As stated in *People v. Woods* (1980), 81 Ill. 2d 537, 542:

> "When a cause is tried without a jury, the law commits to the trial judge the determination of the credibility of the witnesses and the weight to be given their testimony * * * ."

In this case, the trial judge resolved the conflicting testimony of the parties in favor of the State.

Defendant's testimony that when McQuerter lost his balance defendant drew his gun from his waistband does not support his theory that he reasonably believed he was in danger of imminent death or great bodily harm. In shooting McQuerter four times, we cannot believe defendant's actions were in self-defense. We are, therefore, unable to say that the evidence of defendant's guilt was so unreasonable, improbable and unsatisfactory as to leave a reasonable doubt as to his guilt.

■■ Defendant argues that the evidence adduced at trial was insufficient to support a finding of murder and at most he is guilty of voluntary manslaughter. Defendant refers to section 9—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(b)), wherein it states:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

From our review of the evidence in the instant case, we do not find that defendant's belief in using the force he did to prevent death to himself was a reasonable belief.

Defendant cites cases where a heated argument or quarrel reduced murder to manslaughter. (See *People v. Stepheny* (1966); 76 Ill. App. 2d 131, 221 N.E.2d 798.) However, the evidence in the case at bar will not support the allegations of a heated argument or quarrel.

Based on the foregoing, we find the evidence upon which the trial court based its verdict was clearly not so improbable or unreasonable that we should set aside the conviction.

For the reasons stated herein, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P. J., and ROMITI, J., concur.