THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LEON WASHINGTON, Defendant-Appellant.

First District (5th Division)   No. 81—3097

Opinion filed January 20, 1984.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Lawrence J. Stasica, and Mary Alice McKenzie, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

After a jury trial, defendant was convicted of the June 6, 1981, murder of James Riordan and sentenced to 35 years in the Illinois Department of Corrections. Defendant raises several issues on appeal, including the terms of the conviction itself and the length of his sentence, the impact of pretrial publicity on his ability to receive a fair trial and the propriety of a previously substituted trial judge disposing of defendant's motion to substitute for cause. He also asserts several instances of the trial court's alleged abuse of discretion in conducting the trial, and of prosecutorial misconduct. We affirm.

The State presented the following testimony at trial:

Doris Radcliffe, a personal friend of the decedent, testified that she met Riordan at approximately 8:45 the night of June 6, 1981, and the two proceeded to the Marina City Restaurant. The couple met Alice and Marty O'Brien in the bar area of the restaurant and all four ordered drinks. At that time, defendant approached them and standing between Radcliffe and Marty O'Brien, stated that he would go away if O'Brien would buy him a drink. Alice O'Brien then admonished her husband not to dare buy defendant a drink, and told defendant to leave them alone. Defendant responded, saying, "I don't know why she doesn't like me," then stepped between the O'Brien's and pulled out a gun. Radcliffe stepped back a few feet and observed Riordan and Marty O'Brien grab defendant's arm and move him back by the juke box at the south entrance to the bar, with Alice O'Brien following. At that point, Riordan let go of defendant and told the O'Briens to return to their seats. Radcliffe then observed defendant enter the cloakroom and emerge a minute or two later holding a gun. Riordan approached defendant, put his hand on defendant's shoulder, and the two started walking north into the hallway. Radcliffe was six to eight feet behind the men when Riordan stopped. After a few more steps, defendant stopped and turned around. Riordan continued towards defendant, who was now facing him. Both men stopped near a reflecting pool, at which point Radcliffe saw the flash of a gun and heard four shots. Riordan fell into the pool and Radcliffe ran back into the bar area, crying and screaming for help. On cross-examina-

tion, Radcliffe stated that she did not hear Riordan tell defendant that he was a police officer or see him show defendant his badge.

Alice O'Brien testified that she and her husband arrived at the Marina City Bar at 8:45 on the night in question, where they found the south entrance to the bar blocked by defendant and a baby stroller. Defendant was loud, asking the bartendress, "What's the name of this fucking bar and how do I get a drink?" O'Brien shouted across the bar at defendant to shut up. Shortly thereafter, the decedent entered the bar with Radcliffe and the two couples ordered drinks. Defendant approached Marty O'Brien stating, "If you buy me a drink, I'll leave you people alone." O'Brien told her husband not to dare buy defendant a drink and defendant then told O'Brien, "I don't like you." O'Brien heard a click and turned toward defendant, who was holding a gun to her head and pulling the trigger. O'Brien heard two more clicks, after which her husband and Riordan grabbed defendant and walked him over by the cigarette machine. O'Brien got up from her seat and hit defendant in the shoulder with her purse. Riordan told the O'Briens to return to their seats, then went out into the corridor with defendant. O'Brien heard a shot, then several more shots, after which Radcliffe reentered the bar and stated that Riordan had been shot. On cross-examination, O'Brien stated that no one took the gun from defendant, although he had held it to her head inside the bar. O'Brien's husband, Marty, corroborated his wife's testimony.

Psyche Williams was working as bartendress at Marina City that evening. She observed defendant and his friends enter the bar at about 7 p.m. Defendant ordered a drink, and she observed him singing and dancing around the bar, holding a baby. Defendant and his friends ordered a second round of drinks which defendant paid for but did not drink. According to Williams, the O'Briens arrived at around 8 p.m. and defendant's friends left. Defendant approached some customers and asked them to buy him a drink. He then asked Williams to buy him a drink and she told him that he was cut off and must leave. Defendant asked Williams, "Do you know what I could do to you?" Williams stated that she was not scared of defendant and did not call the police. Although she did not think defendant was drunk, she told him to leave because he was bothering her other customers. The remainder of Williams' testimony corroborated that of the O'Briens.

Several other witnesses gave corroborating testimony, including Michael Conte, who observed the men in the hallway, and heard Riordan tell defendant to give him the gun. According to Conte, Riordan grabbed defendant's wrist and defendant brought up the gun and fired three to five times.

Michael Schramm was in the vestibule of the east tower of Marina City when he heard gun shots. He observed defendant walking toward him, holding a gun. When defendant was about 15 feet away, Schramm told him to drop the gun. Defendant told him, "Don't worry man, I'm cool." Defendant then dropped the gun at Schramm's direction, and Schramm kicked it away. Defendant told him, "I used to be a cop" and then said, "I'm sorry, I'm sorry. He was just there."

Officer Barnes, who recovered defendant's gun that evening, testified that it contained three live rounds.

Defendant then testified. On June 6, 1981, he left his home for downtown, intending to do some work at the office. He carried with him a canvas bag containing the .380 semi-automatic pistol which he always carried with him for protection. Before going up to his office, defendant went into an adjacent bar where he met his friends, Catherine Doyle, James Jeske, Jeske's wife and baby. The parties stayed until the bar closed at between 6:30 p.m. and 7 p.m., consuming several beers as well as hard liquor. They then proceeded to the Marina City restaurant and ordered more drinks at the bar. Defendant observed the O'Briens approach the bar and Alice O'Brien's annoyance at the Jeske baby's stroller which was blocking the entrance. Defendant's friends eventually left and defendant went into the washroom, returning to find that his drink was gone. Defendant stated that Williams then told him that she had poured out his drink because he was drunk and would not serve him another. Defendant testified that he then offered to buy someone at the bar a drink. He then asked him, "What the hell is the name of this place you can't even get a drink in?" Alice O'Brien then yelled across at him to shut up. He later asked Williams for another drink which she refused him, telling him to get out. He then asked Marty O'Brien to buy him a drink, at which point Alice O'Brien started yelling and hit defendant with her purse. After exchanging some words, defendant testified that he walked into the cloakroom, attempting to leave the bar. He came out and headed for an "exit" sign. Both the bartendress and Alice O'Brien were still yelling, and "making a big fuss." Defendant stated that as he walked away he was grabbed from behind by Riordan, who had him by the throat and had his left arm pinned down. Riordan told defendant he was "taking [him] the hell out of here." Defendant said to leave him alone and that he was leaving, but Riordan continued to push him, at which point defendant pulled his pistol out from the canvas bag he was carrying and flipped the safety off. Defendant testified that he feared for his safety. He did not attempt to fist-fight Riordan because he had broken bones in his hand. Instead, he tried to

raise up the gun to fire a "warning shot." When Riordan did not let go, defendant fired a burst of three rounds. He heard a splash as Riordan fell away, and saw other people heading toward him. He then obeyed Schramm's directions to drop the gun and stand against the wall until the police arrived and took him in custody. Defendant stated that he did not know if he was drunk that night, but that he was "pretty high."

Defendant was arraigned on June 12, 1981, at which time he moved to substitute out two judges pursuant to section 114—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 114—5(a)) on the basis of alleged prejudice. The motion was allowed, and the cause transferred to Judge Mahon. During a subsequent hearing during which Judge Mahon denied defendant's motion to appoint an investigator, the judge remarked, "It is the bare bones of what I read in the newspapers. There appears to be nothing to be investigated." Defendant then moved to substitute Judge Mahon under section 114—5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 114—5(c)), citing the judge's remark as the reason that he would not receive a fair trial. The cause was transferred to the chief judge for reassignment and the motion for substitution was subsequently heard and denied by Judge Bailey, one of the two judges previously substituted out by defendant. Defendant now argues that Judge Bailey's ruling was of no legal force and effect because he was barred by (Ill. Rev. Stat. 1981, ch. 38, par. 114—5(a)) from proceeding in the cause. He concludes that all proceedings subsequent to Judge Bailey's ruling, including his trial and conviction, are therefore void. We disagree.

■ Section 114—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 114—5(a)) provides that within 10 days after a cause involving one defendant has been placed on the trial call of a judge, defendant may, upon written motion, substitute that judge on the basis of prejudice. In cases of Class X felonies, two judges may be substituted under this section. In addition, subsection (c) of that paragraph provides for the substitution of judges for cause upon written motion supported by affidavit, and states that, "[u]pon the filing of such motion a hearing shall be conducted as soon as possible after its filing by a judge not named in the motion; ***" (Ill. Rev. Stat. 1981, ch. 38, par. 114—5(c)). Thus, the actions of the chief judge were clearly in compliance with the statute where defendant's motion named only Judge Mahon and the motion was assigned to Judge Bailey. Defendant would argue that the plain language of the statute does not apply where, as here, Judge Bailey, although not

named in the motion, had been previously substituted out under another section. Case law indicates, however, that a judge who has previously been substituted from a case may perform formal or ministerial functions concerning the case as long as the action has little or no direct relation to the merits. (*People v. Lewis* (1981), 88 Ill. 2d 129, 160, 430 N.E.2d 1346; *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387.) Further, we have reviewed the record of defendant's hearing before Judge Bailey and find that it was fairly conducted, with all of the proper factors considered, and that defendant's motion was properly denied.

■ A defendant's right to substitute judges for cause is not absolute, but requires substantiation to ensure that his claim of prejudice is not frivolously made. (See *People v. Vance* (1979), 76 Ill. 2d 171, 390 N.E.2d 867; *People v. Myles* (1980), 83 Ill. App. 3d 843, 852, 404 N.E.2d 385, *appeal allowed* (1980), 81 Ill. 2d 597.) A defendant moving for substitution under this section has the burden of showing prejudice on the part of the judge which disqualifies him from sitting as the judge in his case. (*People v. Dunigan* (1981), 96 Ill. App. 3d 799, 811, 421 N.E.2d 1319, *appeal denied* (1981), 85 Ill. 2d 569; *People v. Winchell* (1977), 45 Ill. App. 3d 752, 756, 359 N.E.2d 487, *appeal denied* (1977), 65 Ill. 2d 584.) As stated in *Winchell*, " 'Prejudice is a condition of the mind that imports the formation of a fixed anticipatory judgment as distinguished from opinions which yield to evidence.' " (45 Ill. App. 3d 752, 756; see also *People v. Robinson* (1974), 18 Ill. App. 3d 804, 310 N.E.2d 652, *appeal denied* (1974), 56 Ill. 2d 590.) Given the whole context of Judge Mahon's remark during defendant's motion for a court-appointed investigator, we find that the remark did not, in and of itself, signify that the judge had formed an opinion on the merits of defendant's case. Rather, Judge Mahon simply ruled that there was no basis in law or fact for him to appoint an investigator to help defense counsel prepare his case where defense counsel had a full list of witnesses and the facts of the case were clear to both sides.

■ Defendant next argues that this court must reduce his conviction to voluntary manslaughter where the evidence was overwhelming that he believed that his use of deadly force was necessary to prevent great bodily harm to himself. It is well settled that where the evidence is conflicting, whether a homicide is murder or manslaughter or whether it is justified as self-defense is a question for the jury to decide under proper instructions (*People v. Davis* (1966), 35 Ill. 2d 55, 61, 219 N.E.2d 468), and that this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt

of defendant's guilt. (*People v. Owens* (1976), 65 Ill. 2d 83, 90, 357 N.E.2d 465, *cert. denied* (1977), 430 U.S. 955, 51 L. Ed. 2d 805, 97 S. Ct. 1600; *People v. Sanchez* (1981), 95 Ill. App. 3d 1006, 1010, 420 N.E.2d 80, *appeal denied* (1981), 85 Ill. 2d 572.) It is also clear that in order to justify a conviction of murder it is not necessary to show that the accused deliberately formed an intent to kill; it is sufficient to show that defendant voluntarily and wilfully committed an act, the direct and natural tendency of which was to destroy another's life. (*People v. Davis* (1966), 35 Ill. 2d 55, 61, 219 N.E.2d 468; *People v. Marrow* (1949), 403 Ill. 69, 85 N.E.2d 34.) The intent is implied from the circumstances and character of the act. (*People v. Winters* (1963), 29 Ill. 2d 74, 193 N.E.2d 809.) Further, the trier of fact need not accept as true the defendant's testimony concerning his claim of self-defense, but rather, in weighing such evidence it must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and the testimony of all the witnesses. *People v. Perry* (1980), 91 Ill. App. 3d 988, 993, 415 N.E.2d 523, *appeal denied* (1981), 82 Ill. 2d 587; *People v. Holtz* (1974), 19 Ill. App. 3d 781, 313 N.E.2d 234, *appeal denied* (1974), 56 Ill. 2d 589.

In the instant case, all of the witnesses, with the exception of defendant, testified that defendant was not threatened, pushed or provoked in any way. It was defendant, not the victim, who was brandishing a gun during the incident. Under the circumstances, and given defendant's background as a former police officer, the jury rejected defendant's claim that he acted under the belief, whether reasonable or unreasonable, that the use of deadly force was necessary to protect his own life. We believe that defendant's conviction of murder is well supported by the record before us.

■ Defendant next argues that the trial court abused its discretion by denying him a continuance to allow the impact of prejudicial publicity to abate before trial commenced. Defendant was arraigned on June 12, 1981. On October 26, 1981, defense counsel renewed a request for continuance, which was denied. At that time, the court stated its belief that there had not been publicity which would affect the trial.

Whether a motion for a continuance should be granted because of publicity concerning the case resides within the sound discretion of the trial court, and its judgment will not be disturbed absent an abuse of discretion. (*People v. Kurtz* (1967), 37 Ill. 2d 103, 108, 224 N.E.2d 817; *People v. Brinn* (1965), 32 Ill. 2d 232, 204 N.E.2d 724, *cert. denied* (1965), 382 U.S. 827, 15 L. Ed. 2d 72, 86 S. Ct. 62.) In cases of pretrial publicity, the examination of prospective jurors on *voir dire*

has been recognized as the most valuable means of ascertaining partiality or indifference among persons summoned as jurors. (*People v. Torres* (1973), 54 Ill. 2d 384, 388, 297 N.E.2d 142; *People v. Kurtz* (1967), 37 Ill. 2d 103, 108.) In determining whether a defendant's right to an impartial jury has been violated, a court of review must therefore examine the record of *voir dire* to ascertain whether the jury was adequately questioned as to their exposure to pretrial publicity. Additional considerations are the nature of the publicity and its duration, as well as the utilization of peremptory challenges. (*People v. Madison* (1974), 56 Ill. 2d 476, 309 N.E.2d 11.) Lastly, the procedural methods employed by the trial court to insure that the jury was not prejudiced by the publicity are important to this court's determination.

In the instant case, the trial court questioned each of the prospective jurors thoroughly on *voir dire* as to their actual recollection of the pretrial publicity, their ability to remain impartial and to render a verdict based solely on the evidence. The court excused three jurors for cause when they candidly admitted that they had already formed an opinion about the case. In *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639, the Supreme Court of the United States recognized that "[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43.

Further, our review of the newspaper articles contained in the record reveals that the majority of the publicity appeared within the first several days following the incident and that the accounts of the development of the case were primarily factual in nature.

Lastly, the trial court properly admonished the jury not to read any newspaper accounts of the trial or listen to any radio or television accounts of the case, and asked that in the event that any juror was inadvertently exposed to any media coverage during the course of the trial, that he or she convey that fact to the court in order that he could question them further as to its possible impact. Given all of these factors, we cannot say that the trial court abused its discretion in allowing defendant's trial to proceed almost five months after his arraignment, or that in so doing the court deprived defendant of his right to an impartial jury.

We also reject defendant's argument that the trial court

abused its discretion in refusing to excuse two jurors for cause. Frances Berner stated on *voir dire* that she was a member of the Harwood Heights police committee. Defendant argues that because village trustees and police are exempt from jury duty under section 4 of "An Act concerning jurors, and to repeal certain acts therein named" (Ill. Rev. Stat. 1981, ch. 78, par. 4), Berner's role as a member of the committee rendered her a "hybrid" of these two categories, requiring that she be excused. The facts belie this contention. Berner submitted on *voir dire* to a thorough examination of her function on the police committee, which, she stated, dealt only with finances and appointments. According to Berner, the committee neither discussed crimes nor investigations, and she clearly did not perform the functions of a village trustee or a police officer.

Walter May was challenged based on his statement that he had a tendency to high blood pressure under stressful conditions. Upon further questioning, however, he stated that he had not had an attack for two years and was not presently on medication. He further stated that he had not formed an opinion about defendant's guilt or innocence, and that his condition would not affect his ability to remain fair and impartial. *People v. Kurth* (1966), 34 Ill. 2d 387, 216 N.E.2d 154, cited by defendant is inapposite. In that case, the juror in question had already been selected when it was disclosed that she had severe emotional problems and feared confinement in the jury room. The court there refused to disclose the juror's name and refused counsel an opportunity to question her in order to determine whether her emotional instability would affect her ability to decide the case. In the instant situation, both jurors were thoroughly questioned by the judge as to their mental state, and were also available for questioning by counsel. Significantly, defendant chose not to exercise peremptory challenges in either case. We cannot say that the presence of these two jurors operated to deprive defendant of a fair trial.

■ Defendant next claims reversible error where the trial court "told the jury that capital punishment was not a possibility in the instant case." The record indicates that during *voir dire,* two jurors stated they would have moral difficulties imposing the death penalty. Rosemary Vidacich stated that she would not sign a guilty verdict if capital punishment were involved. The court informed her that it was not, and went on to question her further as to her ability to decide the case based on the evidence. Vidacich was subsequently excused by the defense. David Johnson also appeared to have a question concerning the death penalty. In its efforts to persuade Johnson to express any possible concerns he might have, the court asked him if he was

"worried about the death penalty," to which Johnson replied affirmatively. The court then informed Johnson that the death penalty would not apply, and proceeded to question him thoroughly with regard to Johnson's ability to give both sides a fair trial. In both instances, it is clear that the trial court was merely clarifying the situation for the jurors and not arguing the effect of a guilty verdict in terms of the possible punishment to be imposed, which would be clearly prohibited conduct. We find no prejudice to defendant where, as here, the court clearly fulfilled its duty to insure that the jury was composed of individuals who would base their verdict solely on the evidence.

■■ Nor do we find that the court abused its discretion in prohibiting defense counsel from cross-examining Psyche Williams, an eyewitness, as to bias. Williams was bartendress at Marina City on the night in question. During his cross-examination of Williams, defense counsel attempted to inquire whether Williams had had any conversations with her employer regarding possible law suits relating to the incident, to which she responded that "they had nothing to say to me about it." The State's objection to the line of questioning was then sustained. Defendant now argues that because Williams' testimony contradicted his own intoxication evidence, he was unjustly precluded from showing that the witness may have been motivated to lie by fear of a Dramshop action against her employer and fear of personal liability for having served defendant two rounds of drinks. Initially, we note that at the time of the objection, defense counsel failed to make an offer of proof as to the competency, relevancy or materiality of this line of questioning, and the issue can therefore properly be waived. Nevertheless, we have considered all of the testimony and find that any possible showing of bias on the part of this witness was remote and speculative, and it was therefore properly within the trial court's discretion to sustain the State's objection. See *People v. Ware* (1981), 96 Ill. App. 3d 923, 927, 422 N.E.2d 148, *appeal denied* (1981), 85 Ill. 2d 573; *People v. Nowak* (1979), 76 Ill. App. 3d 472, 395 N.E.2d 28.

■■ Defendant next raises several instances of alleged prosecutorial misconduct, including counsel's reference during the cross-examination of Catherine Doyle to the presence of James Jeske, another of defendant's companions, in the courtroom. Having reviewed the record, we find no prejudice to defendant. While Doyle testified that she observed defendant drinking for several hours before the shooting, she admitted on cross-examination that defendant was not drunk. Further, defendant cannot now complain of counsel's comment where defendant himself interjected Jeske's name into the proceedings to corroborate his theory of intoxication. *People v. Plum* (1976), 44 Ill.

App. 3d 922, 925, 358 N.E.2d 1235, *appeal denied* (1977), 65 Ill. 2d 583; *People v. Pullum* (1973), 10 Ill. App. 3d 745, 295 N.E.2d 315.

Defendant also alleges that his fifth amendment rights were violated where the prosecutor elicited on cross-examination that he did not make any statement about self-defense to Michael Schramm after the shooting, that the prosecutor committed reversible error by emphasizing to the jury that defendant had committed the offense of unlawful use of a weapon, an offense not charged in the indictment, and that several statements made during closing argument deprived him of his constitutional right to a fair trial. We note that defendant neither objected to these alleged errors at the time of trial nor raised them specifically in his post-trial motion, and they may therefore be waived for the purposes of review. Nevertheless, we have examined each of defendant's contentions within the context of the record before us, and we believe that they have been adequately refuted in the State's brief.

Finally, defendant contends that the trial court committed reversible error in refusing to instruct the jury on the affirmative defense of intoxication, and in sentencing him to a term in excess of the minimum sentence. We find that the trial court's ruling was proper as the record is devoid of credible evidence that defendant was intoxicated on the night in question and, in light of the foregoing, that the court did not abuse its discretion in sentencing defendant to a term of 35 years. *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882; *People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861.

Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request that defendant be assessed $50 as costs for the State's defending this appeal and incorporate it as part of the judgment.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

MEJDA, P.J., and LORENZ, J., concur.