IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,516

STATE OF KANSAS,
*Appellee*,

v.

JONATHAN D. BLEVINS,
*Appellant*.

SYLLABUS BY THE COURT

1.

A claim of judicial comment error is reviewable on appeal despite the lack of a contemporaneous objection at trial.

2.

A district court does not err by accurately informing potential jurors that the death penalty is not at issue in a given case in response to a potential juror's stated moral concerns regarding the death penalty.

3.

Prosecutors are entitled to wide latitude to draw reasonable inferences from the evidence in closing arguments. A prosecutor does not err when adequately buttressing their inferential arguments with the factual premises necessary to support their inferences, even in the absence of language such as "it is a reasonable inference that . . . ."

1

4.

Prosecutors commit prosecutorial error by improperly describing their personal opinion to the jury.

5.

A district court's decision not to depart from a presumptive sentence is reviewed for abuse of discretion.

6.

For purposes of evaluating a district court's decision not to depart from a presumptive sentence, the existence of a factor that is arguably mitigating does not necessarily mean that such a factor is substantial and compelling.

Appeal from Jefferson District Court; GARY L. NAFZIGER, judge. Opinion filed May 7, 2021. Affirmed.

*Meryl Carver-Allmond,* of Kansas Appellate Defender Office, argued the cause, and *Caroline M. Zuschek*, of the same office, was on the brief for appellant.

*Natalie A. Chalmers*, assistant solicitor general, argued the cause, and *Derek Schmidt,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: Jonathan Blevins directly appeals his conviction for premeditated first-degree murder in the death of Taylor Sawyer, along with his "hard 50" sentence. Blevins raises six issues for our consideration. Finding no reversible error, we affirm.

FACTS

*Underlying Facts*

On March 14, 2018, Sarah Hemmerling and her daughter Ashlyn Hemmerling contacted law enforcement to report a murder. Based on this information, police arrested Blevins at his place of work in Lawrence, Kansas, later that morning. Along with Blevins' cellphone, tablet, and bag, police confiscated Blevins' 9-millimeter semiautomatic handgun, which had an extended magazine. Blevins gave multiple videorecorded interviews to law enforcement, which we discuss in more detail below. During the third and final interview, Blevins also produced a written statement documenting his then-final version of events.

Armed with the Hemmerlings' information, law enforcement quickly located and identified the body of Taylor Sawyer near Old Military Trail, a pathway close to Perry Lake in Jefferson County, Kansas. Near Sawyer's body—which had suffered multiple head wounds—investigators found a deformed bullet, along with a red bandanna, next to two fresh pools of blood less than 30 feet away from the body. From the markings on the ground, it appeared that the body had initially fallen near the two pools of blood, then been dragged away.

An autopsy of Sawyer's body identified two gunshot wounds to his head. The first was a "graze" wound across his forehead, which fractured his skull but did not penetrate into his brain; the second wound was left by a bullet that entered the back left of Sawyer's head and exited through his left temple, just in front of the ear, leaving a 4.5 cm hemorrhagic tract through his brain. The autopsy did not identify the chronological order of the two shots or which of the two shots killed Sawyer and did not indicate whether one would have been fatal independently of the other.

3

The Hemmerlings also informed law enforcement about a vehicle related to the murder, which officers subsequently located. On that vehicle, officers observed fresh blood spatter on the driver's side front bumper. The blood was determined to be consistent with Sawyer's DNA profile. Investigators also found a spent shell casing on the vehicle's passenger side windshield wiper.

KBI digital forensic examiner Nicole Dekat examined Blevins' phone. Data from that phone was used to compile a timeline of messages sent and received by Blevins between March 13 and March 15. The timeline showed significant activity leading up to 11:30 p.m. on March 13 and more activity after 1:12 a.m. on March 14 but demonstrated a gap of activity between these two times. Dekat testified at trial that if messages sent via a third-party app were deleted from the phone, investigators may not be able to recover them. Dekat also opined that the absence of messages during this time frame would be consistent with the deletion of third-party app messages from Blevins' phone.

During a search of Blevins' residence, investigators found various articles of clothing worn by Blevins at the time of Sawyer's killing the night before, including a bandanna, a pair of shoes, and a hoodie. The right shoe had a spot of blood on it, which was found to be consistent with Sawyer's DNA profile. Investigators also found 9mm ammunition and two spent 9mm shell casings—one on the entertainment center, the other on the bedroom floor. Examination of Blevins' handgun, the fired bullet, and several empty cartridge casings recovered during the investigation revealed that the handgun was operable and had fired the recovered bullet and two of the recovered casings.

Also while in Blevins' residence, investigators found a receipt from a McDonald's in Lawrence dated March 13, 2018, and bearing a timestamp of 10:35 p.m. in Blevins'

residence. McDonald's security cameras recorded Blevins and Ashlyn together at the restaurant for about two minutes. Sawyer did not go inside the McDonald's.

A traffic counter device near Old Military Trail recorded one vehicle arriving and leaving, twice, during the midnight hour of March 14. This corresponded with Blevins' statement that they had arrived, left the area and went to a gas station so that Ashlyn could use the restroom, then returned, then left again after Sawyer was killed. It also corresponded with Blevins' account of the timing of Sawyer's killing—between midnight and 1 a.m. on March 14.

*The First Interview*

Blevins was first interviewed during the early afternoon of March 14, 2018. The overall theme of the story Blevins presented in this interview—which he abandoned later—was that he shot Sawyer in self-defense.

According to Blevins, Ashlyn picked him up from work around 9 p.m.; shortly thereafter, Sarah dropped off Sawyer—Sarah's boyfriend—to hang out with them. Blevins, Ashlyn, and Sawyer then drove around Lawrence for several hours. Blevins noted that Sawyer appeared to be high on something. When the trio stopped at a McDonald's in Lawrence, Ashlyn eventually expressed a desire to "ditch" Sawyer because he was getting "really annoying." Because Ashlyn and Sawyer wanted to smoke marijuana, Blevins suggested they go to Lake Perry—an area with which he was very familiar—to avoid the police.

On Blevins' directions, Ashlyn drove the trio to Old Military Trail, where they all got out. Ashlyn and Sawyer smoked marijuana. When the discussion turned to money, Sawyer grew angry and began to rant about how Sarah owed him money. He then pulled

5

out a gun, saying he would make Blevins and Ashlyn "pay." Blevins expressed confusion as to why Sawyer grew angry at him, since Sarah—not Blevins—owed Sawyer money.

When Sawyer swung up his gun as if to shoot, Blevins drew his gun and fired in self-defense. Claiming Sawyer was facing him, Blevins fired at least twice. Blevins expressed uncertainty as to where his shots struck Sawyer, but he thought he hit him in the head. Blevins denied shooting Sawyer again while he was on the ground. He admitted that he dragged Sawyer's body out of the car's path. He denied picking up shell casings at the scene but admitted that he picked up Sawyer's gun.

Afterward, Ashlyn suggested that they explain the incident as a drug deal gone bad. Ashlyn then called Sarah and asked Sarah to meet up in Lawrence. They left Ashlyn's car in Lawrence, and Sarah drove Blevins to his home in Topeka. On the way, Ashlyn gave Sarah the "drug deal gone bad" story, while Blevins was silent.

*The Second Interview*

At the second interview, which took place later on the evening of March 14, Blevins altered his story significantly. In this interview, Blevins agreed that the story he had given in the earlier interview was not the whole truth and apologized for lying earlier.

Blevins summarized the key difference between this story and his first interview: "Ashlyn wanted me to do it. . . . She wanted me to kill him." According to Blevins, Ashlyn wanted Sawyer dead because she was scared that he would hurt her and her mother in connection with their activities selling drugs. Ashlyn first communicated that she wanted Sawyer dead when they spoke at the McDonald's. Originally, the plan was just to "ditch" Sawyer, but Ashlyn then persisted, asking Blevins if he could "pull the trigger" if Sawyer attacked him. Blevins responded, "Well, I'd have to, but why?"

6

Claiming she was afraid of Sawyer, Ashlyn stated that she wanted Blevins to shoot Sawyer, and when Blevins said he did not think he could, Ashlyn said that she would have to do it. Blevins "figured it was going to get done either way because she made it clear she was going to do it"; he assumed she would try to take his firearm to accomplish the killing.

After leaving the McDonald's and driving for another hour or so, Blevins suggested that they go to Lake Perry because Sawyer was becoming increasingly paranoid, and Blevins believed it would be peaceful out there. Blevins and Ashlyn texted back and forth once they arrived at Lake Perry. In the minutes before the shooting, Blevins considered the idea of killing Sawyer because he did not want Ashlyn to "screw her life up." Blevins elaborated that he knew Ashlyn was going to kill Sawyer—and that she would have to use his gun to do it— and he "didn't want it to be her life that she was throwing away." But Blevins also admitted that Ashlyn would not have been able to take his gun from him if he had resisted. And while Blevins admitted that he did not have to kill Sawyer, he claimed he was scared—scared of what Sawyer could have done to Ashlyn and Sarah, and of what Ashlyn would do to Sawyer. Ultimately, however, Blevins admitted that he shot Sawyer because Ashlyn asked him to.

After Blevins sent Ashlyn several text messages expressing fears about "the body," fears about being discovered, and concerns that he could not go through with it, Ashlyn texted Blevins, "Let's do this." Blevins was standing outside the car with Sawyer when Ashlyn sent this final message; Ashlyn was inside the car. Blevins kept bringing his firearm up, trying to work up the nerve to shoot Sawyer, but only fired after Ashlyn startled him by opening the door and yelling, "Let's do this!" Blevins estimated that he raised and lowered his firearm eight or nine times before finally pulling the trigger.

Sawyer fell after the first shot but drew his gun and waved it around while lying on the ground; Blevins then shot Sawyer again, after which Sawyer lay still. Blevins estimated that maybe a minute or two elapsed between the two shots. Blevins wanted to call an ambulance, but Ashlyn dissuaded him. Ultimately, both Ashlyn and Blevins dragged Sawyer's body away from the place where he fell. Blevins confirmed that he picked up one shell casing from the scene, but he could not find the second casing.

Blevins then repeated his account of Ashlyn's desire to explain Sawyer's absence with a cover story about a drug deal gone bad, a story Ashlyn gave to Sarah on the phone. On the way back to Topeka, Blevins said that "[e]verybody kept blaming themselves, which I found extremely ironic, because it was all my fault."

Blevins gave inconsistent statements during this interview about the point in time at which he knew Sawyer would die that night. Initially, he admitted that he knew, while taking Sawyer out to Lake Perry, that Sawyer would die there, and that he knew how it was going to happen. Later, Blevins claimed he did not know at the time he made the suggestion to go to the lake that they would kill Sawyer; instead, he knew about 15 minutes before the killing, after they had already arrived at Old Military Trail. But he also knew, before they left Lawrence, that Ashlyn wanted Sawyer dead.

Despite these apparent inconsistencies, Blevins assured the interviewing detective that everything he had said in his second interview was the truth. He also apologized to a second detective for "lying" earlier because "you didn't deserve that." Additionally, while breaking down sobbing again, at one point, Blevins expressed that he felt "dirty" and "like a very bad person" because "I know I can't take it back . . . I just want to."

Blevins agreed to give a written statement, at the interviewer's request. Ultimately, however, the second interview was cut short when Blevins suffered an anxiety attack.

8

*The Third Interview*

Blevins was interviewed a third time on March 15 over the course of several hours, although Blevins spent a significant amount of this time writing out his statement and then reading it aloud. This interview was depicted on two separate exhibits at trial, both of which were admitted into evidence: one exhibit containing only the portion in which Blevins read his statement aloud, and the other containing the full interview. Blevins' written statement was presented at trial, along with portions of both exhibits.

Blevins confirmed that he and Ashlyn initially discussed the idea of killing Sawyer at the McDonald's in Lawrence, and, at that point, he knew Ashlyn wanted him to kill Sawyer. He denied that he knew they would kill Sawyer at the time he suggested the trip to Lake Perry, however.

Blevins' emotional distress was obvious throughout much of the third interview. Among other things, Blevins repeatedly emphasized that he kept replaying the events of the shooting in his head and frequently rocked back and forth, cried, held his head, or made reference to physical symptoms of distress. After reading his statement aloud, Blevins again broke down crying, shaking, rocking, and tapping his head against the table and verbally expressing regret over the shooting; this lasted for several minutes. At one point, he asked the interviewing detective for a hug, which was given.

*Blevins' Trial Testimony*

Blevins also testified at trial. According to this account, he got off work in Lawrence around 9 p.m. on the evening of March 13. Ashlyn picked him up from work in her car, and together they waited for Sarah to bring Sawyer. Once Sawyer joined them,

9

the trio drove around Lawrence listening to music. To appease Sawyer, they also listened to a police scanner, because Sawyer thought he had outstanding warrants and wanted to avoid law enforcement.

After making a few stops, the trio went to a McDonald's in Lawrence, where Ashlyn and Blevins got out; Sawyer, who was "paranoid" of the people inside the store, stayed in the car. While inside and away from Sawyer, Ashlyn approached Blevins and asked if they could "ditch" Sawyer somewhere because she and her mom "had been getting really tired of him and really leery because of the way he had been acting." During this conversation, Ashlyn asked if Blevins could shoot Sawyer if he attacked them; Blevins denied that he could, which prompted Ashlyn to say, "'Well, if it needs to come to that, I guess I will.'" Blevins "kind of dropped it at that because [he] didn't take her seriously." Blevins later admitted that Ashlyn had previously "mentioned displeasure" with Sawyer based on his prior violence against her and her mother.

Eventually the trio decided, on Blevins' suggestion, to go to Lake Perry because Ashlyn and Sawyer wanted to smoke marijuana and Sawyer wanted to avoid the police. Although Ashlyn drove, Blevins provided directions to get there during the last portion of the trip. After they arrived, Sawyer and Blevins stayed outside awhile to look at the stars, while Ashlyn went back to the vehicle. In order to provide a restroom for Ashlyn, the three drove to a nearby Casey's—which was closed—then returned to Old Military Trail.

Blevins admitted that the 9mm handgun was his. He had the handgun with him at work on March 13 and carried it with him after work. He left it in the car when he went to look at the stars with Sawyer. Once they returned to Old Military Trail after the excursion to Casey's, Blevins stepped out of the car to smoke, while Sawyer sat on the car's hood. He heard his gun go off and turned around to see that Ashlyn had shot Sawyer

10

in the back of the head. As he ran over, Ashlyn shot Sawyer a second time, and the gun went off again as Blevins wrestled it away from Ashlyn.

After that, Ashlyn and Blevins "started freaking out." They attempted to collect the shell casings from the ground. Sawyer was already "obviously dead." According to Blevins, Ashlyn then dragged Sawyer's body away by herself. Blevins suggested that they call an ambulance, but Ashlyn told him not to, afraid they would get in trouble for having just killed someone.

Ashlyn called Sarah and gave her the story she and Blevins agreed on:  that Sawyer died during a drug deal that had gone badly. Back in Lawrence, Ashlyn stopped at a gas station, where Sarah came to pick them up. Sarah then drove Blevins back to his residence in Topeka, where he told his fiancée the same "drug deal gone bad" story.

The next morning, Sarah picked up Blevins from his Topeka residence and drove him to work in Lawrence. He still had his gun with him. He decided he wanted to turn himself in, but before his shift ended, the police arrived at his place of work and arrested him.

Blevins admitted telling the police initially that he killed Sawyer in self-defense. He acknowledged that this was not the version he had agreed on with Ashlyn. He further acknowledged his subsequent statement taking responsibility for Sawyer's killing as part of a plan he made with Ashlyn. He claimed he made this statement "because Ashlyn was like family to me" and he "wanted [to] try and protect her from the mistake that she had made." He denied the prior statement's veracity because he didn't "want to throw [his] life away for something that somebody else has done."

11

Blevins acknowledged that his trial testimony represented his fourth version of events. He also agreed that the core difference between his trial testimony and the previous versions he had given to police lay in the identity of the shooter. He agreed that Ashlyn had asked him to shoot Sawyer at the McDonald's a few hours before the shooting. He denied telling Ashlyn that he could shoot Sawyer, although he admitted telling investigators that he had said, "'I would if I needed to, but I don't think I could.'" Blevins also denied that he exchanged any messages with Ashlyn around the time of the shooting.

*Criminal Proceedings*

The State charged Blevins with one count of premeditated first-degree murder. The case ultimately proceeded to jury trial. At the conclusion of Blevins' case-in-chief, the district court, with no objection, instructed the jury on first-degree premeditated murder and on aiding and abetting, among other instructions.

In closing arguments, the prosecutor painted the version of the story Blevins gave in his second interview—and reduced to writing in his third interview—as the true recitation of the events surrounding Sawyer's demise. As the prosecutor's closing arguments are at the core of one of Blevins' issues on appeal, we will address them in more detail below.

The jury asked several questions during deliberations, including whether Blevins' hoodie had been tested for gunshot residue, whether the gun had been tested for fingerprints, and what Blevins did with the gun "'at each stop in Lawrence[.]'" The jury also asked for a read back of Dekat's testimony, which was provided; the jury was "interested in hearing about the deleted messages from the night of." Finally, the jury also requested the "brown evidence folder" containing "all the documentary and videotape

12

evidence," which was provided. The jury ultimately returned a guilty verdict on premeditated first-degree murder.

At a subsequent sentencing hearing, the prosecutor again offered several comments that are challenged in Blevins' fifth issue, which we will also discuss below. The district court denied Blevins' request for a lesser sentence and instead imposed a "hard 50" sentence. Blevins then appealed.

ANALYSIS

Blevins raises six issues for our consideration. The first four present claims of error with the trial itself, while the final two challenge aspects of the sentencing process. As discussed below, although we find error in several aspects of the prosecutor's closing arguments, we find that the errors were not individually or cumulatively prejudicial to Blevins. Finding no other errors, we affirm.

*The district court did not err by telling the venire that the trial was "not a capital punishment case."*

Blevins first argues that the district court committed reversible error by informing the jury pool, or venire, that capital punishment was not at issue in the case. Specifically, during the jury selection phase of trial, the following exchange took place:

"[Defense counsel] MR. LAKE: Generic question. Does anybody have anything that comes into their minds that they—that they could not be a fair and impartial juror for these probable three, maybe four days to try this case?

"Yes, sir.

13

"[Prospective juror J.W.]:  Previously you said I should not go with results of what—my question is, does Kansas as a state still have capital punishment.

"MR. LAKE:  Yes, they do.

"[J.W.]:  I cannot put—

"MR. LAKE:  I think I should direct that to the Court.

"THE COURT:  *As I understand it, this is not a capital punishment case*.

"[The prosecutor] MR. NEY:  Correct, Your Honor.

"[J.W.]:  That's what I needed to know.

"MR. LAKE:  State still has it, but this is not one of them. Fair enough?

"[J.W.]:  That's what I needed to know." (Emphasis added.)

Blevins claims that this response diluted the State's burden of proof. Other than jury instructions or legal rulings, we review potentially erroneous judicial comments de novo. *State v. Boothby*, 310 Kan. 619, 624, 448 P.3d 416 (2019). Such errors are evaluated under the constitutional harmlessness test articulated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967):  "the party benefitting from judicial comment error has the burden to 'prove[ ] beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., prove[ ] there is no reasonable possibility that the error affected the verdict,' as with prosecutorial error." *Boothby*, 310 Kan. at 625 (quoting *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 [2011]).

14

The State claims that Blevins failed to preserve this issue for review for a number of reasons, including the absence of a contemporaneous objection and insufficient briefing on judicial comment error or judicial misconduct. We reject these procedural arguments, however, because we believe Blevins adequately briefed the issue as one of judicial comment error, which "is reviewable on appeal despite the lack of a contemporaneous objection at trial." *Boothby*, 310 Kan. at 629. Nor do we accept the State's invitation to revisit *Boothby*.

Turning to the merits, Blevins points to several Kansas authorities suggesting that the jury should not consider the penalty a defendant may be facing if convicted, but he fails to identify any Kansas source identifying a district court's disclosure that a case was not a capital case as error. See PIK Crim. 4th 50.080, 50.090; *State v. Yardley*, 267 Kan. 37, 42, 978 P.2d 886 (1999) (approving a similar jury instruction). See also *State v. Lowery*, 308 Kan. 1183, 1229, 427 P.3d 865 (2018) (finding error in a district court's failure to redact a portion of an interview so that the jury would not hear an officer's speculation about a defendant's potential sentences). Additionally, Blevins points to several federal sources that suggest a jury's fixation on a defendant's ostensibly "light" sentence may make the jury more likely to convict based on punishment, rather than evidence. See, e.g., *United States v. Meredith*, 824 F.2d 1418, 1429 (4th Cir. 1987). However, we find these federal sources inapposite. In the present case, no one suggested that Blevins would be facing a lenient sentence.

In *People v. Washington*, 121 Ill. App. 3d 479, 488, 459 N.E.2d 1029 (1984), which the State cites, the court considered a district court's response to potential jurors' concern about the death penalty. As in the present case, the district court in *Washington* cut through this moral Gordian knot by disclaiming the applicability of the death penalty altogether to the case at bar, thus alleviating the jurors' concerns and ensuring "that the

15

jury was composed of individuals who would base their verdict solely on the evidence." 121 Ill. App. 3d at 489.

The Tenth Circuit considered a similar scenario in *Fero v. Kerby*, 39 F.3d 1462, 1481 (10th Cir. 1994). There, "[d]uring voir dire, in response to a venireman's remark, the trial court informed the venire that the state was not seeking the death penalty." 39 F.3d at 1481. In response to the defendant's claim that the district court's actions violated his right to due process, the Tenth Circuit noted that "[i]t is constitutionally permissible to question the venire during voir dire about their attitudes concerning the death penalty in a case where the prosecution is seeking the death penalty" and that, based on the logic of the cases that had so held, "we feel it equally acceptable for constitutional purposes that a venire be informed by the trial judge that the state is not seeking the death penalty." 39 F.3d at 1481-82 (citing *United States v. Steel*, 759 F.2d 706, 710-11 [9th Cir. 1985], and *State v. Hernandez*, 115 N.M. 6, 22, 846 P.2d 312 [1993], as examples of cases where, it was held, a district court did not err by informing a jury that the prosecution was not seeking the death penalty).

We find the reasoning of these authorities persuasive. Instead of diluting the State's burden of proof, as Blevins suggests, the district court's answer kept the jury focused on the evidence, not on the potential for a punishment that at least one potential juror found morally objectionable. Moreover, as the State notes, the district court's answer was also factually correct—the State was not seeking the death penalty. Considering the significant differences between the death penalty and all other forms of punishment authorized by Kansas law, we find no error in the district court's revelation to the jury that capital punishment was not at issue here. Likewise, the mere observation that the death penalty is inapplicable in a particular case does not imply that the defendant's potential sentence, if convicted, would be light. Consequently, the district court's answer did not lower the State's burden of proof.

16

*The jury instruction on aiding and abetting was both legally and factually appropriate, and thus the district court did not err in issuing this instruction.*

Blevins next claims the district court committed clear error by instructing the jury on the theory of aiding and abetting. When presented with a claim that a district court has erred in issuing or refusing to issue a jury instruction:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*Ward*, 292 Kan. at 565]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

"The first element of this analysis ultimately affects the last one 'in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible.'" *State v. Ross*, 310 Kan. 216, 223, 445 P.3d 726 (2019) (quoting *State v. Barber*, 302 Kan. 367, 377, 353 P.3d 1108 [2015]). If, as here, a defendant does not object to a district court's jury instructions, an appellate court

"appl[ies] the clear error standard mandated by K.S.A. 2017 Supp. 22-3414(3). Under that standard, an appellate court assesses whether it is 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.' [The defendant] has the burden to establish reversibility, and in examining whether he has met that burden we make a de novo determination based on the entire record. [Citations omitted.]" *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018).

17

The jury instruction given by the district court stated:

> "A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime, intentionally aids another to commit the crime.

> "All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime."

Blevins concedes that he did not object to this instruction. He also concedes that the instruction was legally appropriate as an accurate recitation of Kansas' aiding and abetting law. See, e.g., *State v. Betancourt*, 299 Kan. 131, 140, 322 P.3d 353 (2014).

Instead, Blevins argues this instruction was factually inappropriate due to insufficient evidence.

As Blevins notes, the prosecutor's closing arguments focused on the notion that Blevins and Ashlyn began to plan Sawyer's killing at the McDonald's in Lawrence, hours before the shooting. Although the prosecutor's primary contention was that Blevins actually pulled the trigger, he stated during rebuttal that Blevins would also be guilty of murder via aiding and abetting if Ashlyn had pulled the trigger. Specifically, the prosecutor said:

> "Even if these roles were reversed, even if Jonathan Blevins today was the emotional wreck that you saw on the video, even if he had had an anxiety attack today

18

saying, 'No, this is what happened. For the fourth time, this is what happened. Ashlyn shot him.' Even if that was the case, his participation in the crime, his contemplating the idea of the shooting, having someone ask him to shoot Taylor Sawyer hours before, his giving the idea of where to go in Jefferson County, his bringing the only gun that would work out to the location with him, his—even if he had left the gun in the car, these are all convenient facts where he put himself in the stream of inevitability to make him just as liable even if this is the true emotional wreck Jonathan Blevins story.

"We know that's not the case. We know this was the recitation of a different story. We know—and you can weigh the credibility of which Jonathan Blevins you believe, the one 24 hours after the murder or the one today that changes one fact about what happened.

"But even if that's the one, he is still liable for first-degree murder because he aided Ashlyn Hemmerling in her plan."

Blevins argues that his trial testimony did not support the prosecutor's proposed alternative version of events. Blevins testified that, while Ashlyn mentioned the idea of killing Sawyer at the McDonald's, he did not believe that she was serious. Additionally, he testified that, when Ashlyn asked if he could kill Sawyer, he responded, '"I would if I needed to, but I don't think I could.'" Furthermore, Blevins claimed he came up with the idea to visit Old Military Trail because Sawyer and Ashlyn wanted to smoke marijuana, but Sawyer was too paranoid to do so in town.

However, taken in a light most favorable to the State, there is sufficient—albeit scant and somewhat contradictory—evidence that could support a jury's finding that Blevins aided and abetted Ashlyn in the killing. Among the different versions of events Blevins portrayed, the jury could have found:

- that Ashlyn had told Blevins at the McDonalds "[s]he was going to do it either way";

- that Blevins had a gun which he was carrying in a holster that evening;

- that Blevins knew Sawyer would have to be killed with Blevins' gun;

- that while still in Lawrence, Blevins suggested they go to Lake Perry, knowing it as a remote destination, when he already knew *Ashlyn* wanted Sawyer dead;

- that Blevins "figured it was going to get done either way because she made it clear she was going to do it" and believed that Ashlyn would try to take his firearm to accomplish the killing;

- that Blevins texted Ashlyn in the minutes before the shooting in an attempt to discuss his fears about the body, fears about being discovered, and concerns that he could not go through with the shooting; and

- that Ashlyn shot Sawyer with Blevins' gun, which he would have taken out of its holster and left in the car within her reach, despite Ashlyn's earlier remarks about wanting Sawyer dead.

If those findings were made, the jury could have inferred Blevins' intent to provide Ashlyn with the location and weapon to commit Sawyer's killing, even if the State's primary theory was that Blevins himself pulled the trigger. Consequently, we conclude that the aiding and abetting instruction was factually appropriate. The district court did not err in issuing this instruction.

*Although the prosecutor committed error in several aspects of closing arguments, the errors do not require reversal either individually or cumulatively. Likewise, cumulative error does not require reversal.*

Blevins next raises several claims of prosecutorial error arising out of the prosecutor's closing arguments previously referenced. Although we may consider the presence or absence of a contemporaneous objection in analyzing an instance of alleged prosecutorial error, no objection is needed to preserve the matter for review. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017). There are two steps to our prosecutorial error analysis:

> "[T]he appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6).

This "wide latitude" extends to alleged errors made in closing arguments. *State v. Tahah*, 302 Kan. 783, 787, 358 P.3d 819 (2015). In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation. *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018). In crafting closing arguments, a prosecutor is permitted to discuss the evidence and draw "'reasonable inferences from

that evidence.'" *Tahah*, 302 Kan. at 788 (quoting *State v. Crawford*, 300 Kan. 740, 749, 334 P.3d 311 [2014]).

Blevins claims the prosecutor erred in several different instances and in at least four ways: by misstating the law of aiding and abetting, by making at least four misstatements of fact, by giving his personal opinion in two instances, and by commenting on Blevins' credibility in two instances. We address each category of alleged error in turn.

*Misstatement of Law*

Blevins first challenges the prosecutor's comments on the issue of aiding and abetting. Blevins correctly notes that, regardless of "convenient facts," the State still needed to prove that Blevins acted with the specific intent to bring about Sawyer's death with premeditation.

We agree that these remarks, overall, conveyed an incorrect formulation of the law. The prosecutor's statement, while hedged against his broader theory that Blevins was the shooter, erroneously suggested that mere "convenient facts" would be enough to lead to a conviction of premeditated first-degree murder for aiding and abetting. At no point during the prosecutor's discussion of these "convenient facts" did the prosecutor acknowledge the need for a showing of specific intent to commit murder with premeditation; instead, the prosecutor vaguely alluded to a "stream of inevitability" that veered dangerously close to ignoring intent altogether. This was improper.

However, we conclude that this error was harmless. Although the "stream of inevitability" argument was ill-advised, they were not given in a vacuum. The prosecutor prefaced these remarks with a correct recitation of the law of aiding and abetting—

22

including a recognition of the State's burden to establish that the defendant acted with "the mental culpability required to commit the crime." Moreover, the prosecutor undercut his own statement—which was only given in rebuttal—by repeatedly pointing out the strength of the evidence suggesting Blevins himself was the shooter, not merely an accomplice. As discussed earlier, the facts supporting an aiding and abetting theory would have required the jury to embark on a narrow path of reasoning in order to arrive at a conviction. Given the strength of the video evidence to which the State presumably referred—particularly the numerous admissions of guilt Blevins made in the recorded interviews and his obvious emotional state while making them—we find beyond a reasonable doubt the jury would not have been led astray by the prosecutor's unfortunate references to "convenient facts" and a "stream of inevitability."

*Misstatements of Fact*

Blevins next challenges three separate prosecutorial statements of fact. (Blevins has since conceded that a fourth challenged statement—that Sawyer's gun was nonfunctional—was not error.) Specifically, Blevins claims that the italicized portions of each of the following excerpts are factually unsupported:

- "We know, for example, that he shot [Sawyer] in the back of the head first. That's the first shot. *That was the kill shot.* That was the shot he made while standing behind [Sawyer] . . . ."

- "[H]e had [the plan to kill Sawyer] in his mind *when he told Ashlyn in McDonald's that he would shoot [Sawyer] if he had to.*"

23

- "*There's no question that there was a plan that was created*, a conversation that was had at McDonald's, about what was going to happen with [Sawyer] that night."

We do not view the first statement as erroneous, although it was imprecise. Blevins correctly notes that the autopsy report was silent as to which of the two shots killed Sawyer. Additionally, the autopsy report did not identify the chronological order of the shots. However, Blevins' own written statement admitted that he delivered his first shot while standing behind and to the left of Sawyer, which would correspond with the gunshot wound to the back left of Sawyer's head—which, the autopsy report noted, left a 4.5 cm hemorrhagic tract through Sawyer's brain before exiting his left temple. Blevins also admitted to shooting Sawyer in the forehead with his second shot, which corresponds with the graze wound mentioned in the autopsy report—a wound which fractured Sawyer's skull but did not apparently penetrate into his brain. From context, it is clear the prosecutor did not mean that the first shot instantly killed Sawyer; otherwise, he would not have referenced Sawyer "writhing on the ground" at the time of the second shot. Instead, it appears reasonable to infer that a gunshot wound that left a 4.5 cm pathway through Sawyer's brain would have been fatal, even if the autopsy report is silent on whether that wound would have been *individually* fatal. Consequently, the term "kill shot" was not prosecutorial error.

Nor was the second statement erroneous. Although Blevins gave inconsistent versions of his response to Ashlyn's query as to whether he could kill Sawyer, in at least one version of events, he told Ashlyn that he would shoot Sawyer, if he had to. At trial, for instance, Blevins both denied telling Ashlyn that he could shoot Sawyer, when she mentioned it at McDonald's, and also admitted telling investigators that he had said, "'I would if I needed to, but I don't think I could.'" Additionally, in at least one portion of his second interview, Blevins described Ashlyn asking him if he could "pull the trigger" if

Sawyer attacked him; Blevins responded, "Well, I'd have to, but why?" Consequently, while the prosecutor could have added the appropriate equivocations to clarify that Blevins admitted to saying *several* things in response to Ashlyn's overture, his statement was not, overall, factually unsupportable.

Finally, Blevins attacks the prosecutor's use of the phrase, "There's no question that there was a plan that was created," by pointing out that this very issue was "central to the trial." The State claims the disputed language—"[t]here's no question"—constitutes argument, not assertion of fact, but goes on to argue that, even if it was an erroneous statement of fact, it was harmless.

In *State v. Timley*, 311 Kan. 944, 951, 469 P.3d 54 (2020), the court recognized the inaccuracy of the prosecutor's use of the word "exactly" to characterize a phone's location when the evidence, in fact, did not show the phone's "exact" location. However, a majority of the court agreed that the prosecutor appropriately buttressed the offending language with the factual premises necessary to communicate to the jury that this word represented the prosecutor's own inference, not a recitation of fact. *Timley*, 311 Kan. at 951-52. Although the majority recognized that the prosecutor was not required to say "the unspoken, but implicit, disclaimer inherent in all . . . arguments, i.e., 'If you look at the evidence, a reasonable inference is that . . . ,'" it further noted that the prosecutor only "barely" avoided error "[b]y clearly establishing the evidentiary bases upon which their conclusion rested." 311 Kan. at 951-52.

Here, the prosecutor's statement was followed by additional explanation:

"There's no question that there was a plan that was created, a conversation that was had at McDonald's, about what was going to happen with [Sawyer] that night.

25

[Sawyer], who was tweaking; [Sawyer], who was not in his right mind; [Sawyer], who had no place to go.

"They picked him up. They took him to a remote location. Jonathan Blevins provided the location, provided the gun, and he shot him.

"Ashlyn Hemmerling provided the idea. Ashlyn Hemmerling provided the encouragement. Ashlyn Hemmerling provided help after the fact. Ashlyn Hemmerling pointed at Jonathan Blevins after he shot Taylor Sawyer and said, 'You're going to go to prison,' and Ashlyn Hemmerling helped cover up the crime.

. . . .

"As Counsel said, the scientific evidence in this case is overwhelming regarding what happened:  [Sawyer] shot execution style in the back of the head from an indeterminate range by a 9-millimeter handgun that the defendant had on his person when he was arrested. He literally had the defendant's [*sic*] blood, not on his hands, but on his shoes. He knew this, racked with guilt, the night he was confessing, not once, but twice, to Randy Carreno, and he knew and couldn't believe that he had entertained this idea for two hours and seriously planned to do it for 15 minutes before he shot him in the back of the head."

We conclude the challenged statement veered over the line of fair comment. While the factual premises the prosecutor set forth after the comment support the inference that a plan existed, they do not support the assertion that there was *no question* on this point; indeed, mere moments later, the prosecutor noted that the evidence showed Blevins had only "seriously planned" the crime for 15 minutes before the shooting. Thus, the prosecutor's use of the phrase "[t]here's no question" more closely resembles his use of "we know" elsewhere in closing arguments—a phrase that is only "acceptable when it 'does not indicate [the prosecutor's] personal opinion, but demonstrates that the evidence was uncontroverted.'" *State v. King*, 308 Kan. 16, 34, 417 P.3d 1073 (2018) (quoting

26

*State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 [2006]). In using the phrase "[t]here's no question," we conclude that "the prosecutor was drawing inferences for the jury, not stating uncontroverted evidence"—thus rendering the phrase erroneous, "even if the inferences being drawn were reasonable." Cf. *King*, 308 Kan. at 34 (applying this analysis to the phrase "we know").

However, we also view this error as harmless. Regardless of whether the plan was hatched at McDonald's or merely an idea communicated there, the prosecutor appropriately noted that the evidence suggested premeditated conduct beginning at least 15 minutes before the shooting. And though the prosecutor incorrectly stated there was *no* question as to whether the plan originated at McDonald's, the jury had heard plenty of testimony—and argument—about that very point. Thus, while the prosecutor essentially overplayed his hand, we believe beyond a reasonable doubt that the verdict was not affected by it.

*Giving Personal Opinion*

Blevins next points to two instances in which the prosecutor improperly disclosed his opinion to the jury, again marked in italics:

- "So the sole question that I believe that you must answer, *which I believe has a clear answer, is not whether he intentionally killed* [*Sawyer*]—*that much is clear from the evidence*—*but whether he did so with premeditation*."

- "I'll reserve the balance of my time for after Counsel speaks, *but I believe that, beyond a reasonable doubt, the evidence has supported that Jonathan Blevins intentionally killed Taylor Dean Sawyer and did so with premeditation*."

The State concedes both statements were erroneous, in light of *King*, 308 Kan. at 33, and *State v. Pruitt*, 310 Kan. 952, 966, 453 P.3d 313 (2019). Prosecutors commit error by giving their personal opinions to the jury. Prosecutors are not witnesses—expert or otherwise. As the ubiquitous jury instruction advises, their statements are not evidence. But the State argues both errors were harmless based on overwhelming evidence and on the prosecutor's accompanying recitation of the factual basis for his asserted beliefs. We agree.

The videos of Blevins' interviews and his accompanying handwritten statement provide strong, at times emotionally charged, evidence of his guilt in the premeditated killing of Sawyer. Blevins tearfully admitted his role in the murder numerous times over the course of several hours of interviews—admissions bolstered by the fact that the murder weapon was his, that he continued to carry the murder weapon with him after the shooting, that he had the victim's blood on his shoe, and that he was familiar with the area where the murder occurred—which the trio visited at his suggestion. Additionally, although no text messages were recovered from Blevins' phone, forensic testimony regarding the gap in the phone's activity beginning at 11:30 p.m. on the evening of the shooting corroborated Blevins' admission that he texted Ashlyn about the shooting beforehand, thus providing additional evidence of premeditation.

While it is impossible to determine the emphasis placed on the challenged words from the cold record, we note that the prosecutor's errors of repeating "I believe" appear to resemble verbal tics of the sort more commonly employed as syntax filler—the brain shifting into neutral, so to speak—than an attempt to bolster weak evidence with a prosecutorial testimonial. We nevertheless admonish the prosecutor to refrain from such equivocations in the future—in a case with less overwhelming evidence, careless

28

prosecutorial reliance on such tics as a way of maintaining a sentence's cadence could undermine our confidence in a verdict's fairness.

*Comments on Credibility*

Finally, Blevins points to the following instances where, he claims, the prosecutor impermissibly commented on Blevins' credibility by telling the jury what was "true":

- "That's an important point to consider, that after he had needed medical attention, after he had been overcome with anxiety about the weight of what he had done, he came back after receiving medical attention, came back, requested to provide a 13-page written statement, provided that statement, which completely corroborates what he had said the night before. This is not something that he could have rehearsed. *This is the truth*, and it was provided in verbal, written form, emotional form, and written form [*sic*] the next day."

- "We know [Blevins' trial testimony was] not the case. We know this was the recitation of a different story."

The State argues that, because Blevins himself said the statements he gave in the second and third interview were "the truth," the prosecutor was merely commenting on the evidence. Admittedly, Blevins not only told law enforcement that his statements during these two interviews were the truth, he even apologized to multiple detectives for "lying" in his first interview—even going so far as to tell one detective, "[Y]ou didn't deserve that." However, the prosecutor did not say that *Blevins* said his written statement was "the truth"—the prosecutor *himself* said as much. Consequently, his comment was in error. But, as Blevins himself repeatedly attested to the truth of the statement championed

29

by the prosecutor as "the truth," we have little difficulty in further concluding that this error was harmless.

The same analysis applies to the second challenged statement. While we consider such bolstering to be error, the prosecutor also told the jury it could "weigh the credibility of which Jonathan Blevins you believe, the one 24 hours after the murder or the one today that changes one fact about what happened." Combined with the overwhelming evidence of Blevins' guilt produced by Blevins himself, we find that this clarification sufficiently nullified any harm that could have arisen from the prosecutor's insinuation.

*Harmlessness*

To recapitulate, we have determined that the prosecutor erred by misstating the law of aiding and abetting, by misstating the facts by claiming there was "no question" Blevins and Ashlyn hatched their plan at McDonald's, by twice inappropriately giving his personal opinion on the facts of the case with respect to the identity of Sawyer's killer, and by twice commenting on Blevins' credibility—a total of six individual errors. Although we have concluded that these errors were individually harmless, their cumulative impact must also be considered.

Blevins asserts that the combined effect of the errors undermined his defense that Ashlyn killed Sawyer and that Blevins only confessed in an effort to spare Ashlyn from prosecution. Indeed, we find the prosecutor's many errors troubling. However, the prosecutor's erroneous statement of law appears unrelated to the remaining errors, as the prosecutor overall attempted to discount the aiding and abetting theory even while maintaining it as a possibility. Additionally, the prosecutor's erroneous statement as to the absence of a question about the existence of a plan at the McDonald's appears irrelevant, as the evidence also showed evidence of a plan at least 15 minutes before the shooting

30

and Blevins himself described repeatedly raising and lowering his weapon as he prepared to shoot Sawyer from behind. Finally, the commentary on the identity of Sawyer's killer is largely supported by the recordings of Blevins' second and third interviews—as are the prosecutor's comments on which version was "the truth," since Blevins himself offered the same commentary in his interviews.

Thus, ultimately, the powerful impact of the interviews, themselves, was the greatest enemy to Blevins' version of events at trial— which was his fourth version overall (and the third version given to authorities). The uncontroverted evidence places Blevins at the scene of Sawyer's death; the only questions raised by his defense lay in the identity of the shooter and in whether Blevins agreed to go along with a plan to shoot Sawyer. On these two questions, nothing the prosecutor said or did has undermined Blevins' credibility more than his own recorded words and demeanor.

Additionally, the jury was also given the following instruction: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." Between this instruction and the overwhelming evidence presented, we find the prosecutor's errors here to be cumulatively harmless. See, e.g., *State v. Killings*, 301 Kan. 214, 239, 340 P.3d 1186 (2015) (overwhelming evidence of guilt sufficient to establish harmlessness of prosecutorial error—then "misconduct"—in closing arguments); *State v. Tully*, 293 Kan. 176, 206, 262 P.3d 314 (2011).

We note that Blevins has also raised a claim of cumulative error based on the two issues discussed above and his asserted claims of prosecutorial error. As we have already found the prosecutorial errors cumulatively harmless beyond a reasonable doubt and have found no errors with Blevins' other claims of trial error, we need not embark upon a

separate cumulative error analysis here. Blevins is not entitled to a reversal on the basis of cumulative error.

*The prosecutor did not commit error at the sentencing hearing.*

Next, Blevins claims the prosecutor misstated the facts on no fewer than five different occasions during sentencing. Our standard of review of prosecutorial errors in non-trial hearings is identical to the one set forth above. See, e.g., *State v. Wilson*, 309 Kan. 67, 77, 431 P.3d 841 (2018). Blevins challenges the italicized portions of the following statements:

- "Ultimately, *there was only one person that was responsible for—directly responsible for the killing and murder of* [*Sawyer*]*, and that's* [*Blevins*]."

- "[*Blevins*] *not only pulled the trigger, shooting* [*Sawyer*] *in the back of the head and then shooting him again as he writhed on the ground, but he had discussed this plan of execution with Ashlyn Hemmerling at the McDonald's and then proceeded to discuss with her the concerns he had about getting rid of the body . . . .*"

- "The other thing that is senseless about this case is how [Blevins] could seem to be on the path to reconciling his own mind with what he had done by telling law enforcement . . . *only later to a year later come* [*sic*] *up with a fourth story to try to minimize his actions and even disclaim pulling the trigger at all to try to pin it on Ashlyn Hemmerling. That is truly senseless, and it shows a man who has approached but has failed to appropriately reconcile in his own mind . . . the fact*

32

*that* [*Sawyer*] *is dead because of his own act, the fact that he pulled the trigger and shot him in the back of the head a year ago.*"

- "The defendant—[the] fourth [mitigating circumstance], the defendant was an accomplice in a crime committed by another person. The defendant's participation was relatively minor. Again, this was simply not credible. *He pulled the trigger.* [*Blevins*] *pulled the trigger*. He's the one that came up with the location. He's the one that told law enforcement that he was trying to prevent Ashlyn from throwing away her own life. *He was the direct assailant*."

- "Admittedly, [Blevins] was 22, 23 at the time of the crime, a young adult man, but he also started his felony record when he was 15 years old. *He participated in the drug culture, gun culture, since then*."

The first four challenged statements all center on one theme: the identity of Sawyer's killer. Blevins argues that this was merely the State's primary *theory* of the case and, thus, the prosecutor misstated the evidence. Blevins analogizes the case to *Wilson*, 309 Kan. at 78, claiming that the State relied on unproven allegations. We disagree.

Unlike in *Wilson*, where the prosecutor's arguments were predicated largely on allegations outside the scope of the defendant's *plea*, the prosecutor's first four comments here were supported by some evidence presented at *trial. Wilson*, 309 Kan. at 78 ("What the prosecutor did was ask the district court to base its decision on allegations unsupported by evidence. When a prosecutor argues facts outside the evidence, the first prong of the prosecutorial error test is met."). While Blevins argues that these facts were not uncontroverted and that it cannot be known whether the jury convicted Blevins based on an aiding and abetting theory or based on the State's primary theory that he was the

33

principal actor in Sawyer's killing, he cites nothing to demonstrate that a prosecutor errs by repeating the State's theory of the case at sentencing, so long as that theory is supported by sufficient evidence presented at trial—and reasonable inferences drawn from that evidence. These comments did not extend beyond the "wide latitude" afforded to the prosecutor to comment on the evidence.

The final statement gives us more pause. There is little evidence in the record of Blevins' activities *since* he was 15 years old. On the other hand, the prosecutor's remark appears more akin to a comment on Blevins' general interests and environment, rather than an attempt to mislead the judge about facts not in evidence. We note that Blevins himself disclosed to his interviewers that he had dated another daughter of Sarah Hemmerling for roughly five years, viewed Ashlyn like a "little sister," that Ashlyn and Sawyer smoked weed, that Sawyer was "tweaking," and that both of the guns at the scene—including the one in Sawyer's possession—were Blevins' own. The prosecutor's remarks can be seen as reasonable inferences drawn from these facts.

But we need not read the tea leaves of what the prosecutor meant by "drug culture" and "gun culture" too closely, because in any event we find the comment harmless. The sentencing judge also presided over the trial and would have been well aware of the company—and arms—Blevins kept. The judge was also privy to the presentence investigation report documenting any criminal history that the State could show. Accordingly, we cannot conclude that the prosecutor's remark, even if overbroad, posed the risk of altering the district court's sentencing decision.

*The district court did not abuse its discretion by refusing to depart from the presumptive "hard 50" sentence.*

Finally, Blevins argues that the district court erred by refusing to depart from the presumptive "hard 50" sentence otherwise applicable under K.S.A. 2020 Supp. 21-6623 and K.S.A. 2020 Supp. 21-6620(c). Under these statutes, the district court was required to impose a presumptive "hard 50" sentence unless the district court found "substantial and compelling reasons, following a review of mitigating circumstances, to impose" a lesser sentence. We review the district court's decision not to depart from a presumed sentence for abuse of discretion. *State v. Galloway*, 311 Kan. 238, 252-53, 459 P.3d 195 (2020).

Blevins sets forth four mitigating factors which, he submits, constituted substantial and compelling reasons to depart: his relatively young age (22) at the time of the murder, his relatively limited criminal history, evidence that Ashlyn was the "'moving force'" behind the murder, and the support of his fiancée and children. He argues that these factors have been previously determined to be substantial and compelling reasons to depart and thus asserts that the district court abused its discretion in refusing to grant a departure sentence.

Although the district court did not explain its decision at length, it briefly noted that it found "no compelling reasons that exist or no mitigating circumstances that exist that the Court can reasonably construe to reduce the sentence in this case." Importantly, the existence of a factor that is arguably mitigating does not necessarily mean that such a factor is "substantial and compelling." See, e.g., *State v. McLinn*, 307 Kan. 307, 348-49, 409 P.3d 1 (2018). We cannot conclude that *no* reasonable individual would have declined to find Blevins' proffered mitigating factors substantial and compelling reasons to depart from the presumptive sentence. Consequently, we affirm Blevins' sentence, as well as his convictions.

## CONCLUSION

Finding no reversible error, we affirm.

STEGALL, J., not participating.